[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 107.]

THE STATE OF OHIO, APPELLEE, *v*. DAVIS, APPELLANT.

[Cite as *State v. Davis*, 1996-Ohio-414.]

*Criminal law—Aggravated murder—Death penalty upheld, when—State fails to prove defendant guilty of attempted rape, when.*

(No. 95-1556—Submitted March 20, 1996—Decided July 24, 1996.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 64270.

_____

{¶ 1} Early in the morning of November 26, 1991, two days before Thanksgiving, Amy Perkins, the wife of a popular Cleveland radio personality, was kidnapped from a downtown Cleveland parking lot. She was found fatally shot through the head, thrown out of her car, naked, unconscious, and left for dead. In connection with this incident, a Cuyahoga County jury convicted appellant, Wiley Davis, of aggravated murder and sentenced him to death.

{¶ 2} At approximately 8:15 a.m. that day, Mattie Baker saw Davis pacing back and forth in the parking lot where she parked her car. Because Baker recognized him as an employee of a restaurant where she often lunched, she would have spoken to Davis, but he disappeared before she exited her car.

{¶ 3} Baker went to pay for her parking space, but had to walk back to her car because she forgot the number assigned to her space. While approaching her car, Baker again saw Davis, who was now sitting on the driver's side of a gray Toyota with Texas plates parked in the space next to her car. A white female with a "terrified look" was sitting in the passenger seat. Assuming that the woman was in trouble, Baker tried to summon help, but was unsuccessful. Around 9:00 a.m., Gwendolyn Brice looked out the window of her house and observed a small gray four-door car with Texas plates sitting at a stop sign, with a white female inside making a motion with her hands as if "[p]ushing away" something. Brice then

heard a "pop," saw glass shatter on the passenger side, and saw the woman's head drop.

{¶ 4} Moments later, Brice's aunt, Marjorie Johnson, arrived at the house and parked behind the gray car. Johnson saw a black male with "a full head of hair" as the driver of the car, and a white female in the passenger seat with her head hanging out the window. When the driver looked at his rear-view mirror and saw Johnson, he "pulled off" at high speed.

{¶ 5} The next person to see Davis was Nancy Brown, who was parked in her car while waiting with her son and his friends for the school bus to arrive. As she and the children sat in the car, Brown witnessed a blue or dark gray Toyota moving very slowly across the intersection. The driver, whom Brown described as "a dark male" with a "Jheri curl" was leaning over the passenger seat, trying to close the passenger-side door "as if it was stuck, or jammed."

{¶ 6} After the car passed, the children drew Brown's attention to a person lying behind some bushes. Brown immediately went down the street to investigate. She discovered a nude white female, unconscious and "barely living." The woman was trying to speak, "but nothing was coming out." Brown ran to a nearby house to call 911. When she returned, she covered the victim with a borrowed blanket and waited with the victim for the ambulance to arrive. Brown specifically testified that the victim was wearing no jewelry. The victim was taken to a hospital, where she died. David Perkins later identified the victim as his wife, Amy Perkins.

{¶ 7} About twenty-five minutes after the shooting, the owner of a nearby deli noticed a gray Toyota with Texas plates parked in his lot. When he later went out to look at the car and saw its broken windshield and blood in the car, he called the police. When the police arrived, they found a Federal brand .32 caliber shell casing five to ten feet from the driver's side of the car. In the car, police found the victim's clothing, a checkbook, some personal items that appeared to have been rifled through, and fresh blood on the floor.

**{¶ 8}** Davis did not report to work on November 26 and did not answer the phone when his boss called his home at 8:45 a.m. Later that morning, however, Davis went to his sister Annette's house, which is located approximately three hundred yards from where the victim's car was discovered. When Davis arrived, his sweatsuit had bloodstains on the right side, which Davis explained by claiming that he accidentally shot someone in an altercation. Davis asked Annette's boyfriend, Alfonso Herring, Jr., to loan him a pair of pants and keep the gun for him. Herring hid the gun in a closet and gave Davis a pair of work pants and a sweatshirt. Davis changed and washed the blood off his sweatsuit, which he left hanging in the bathroom. Davis left his sister's house at 9:40 a.m. with his mother.

**{¶ 9}** Later that afternoon, Cleveland police arrested Davis at his girlfriend's house. When the officers executed a warrant to search the house, they found a right shoe with bloodstains on its right-hand side, above the heel, a box of Federal brand .32 caliber ammunition and loose bullets of the same type, but no gun.

**{¶ 10}** After being warned that the police had asked for Annette's address, Herring took Davis's clothes and the gun from the closet, put them in the trunk of his car, and left. Despite a request from Davis not to turn over the gun and clothes to the police, on November 29, upon the advice of an attorney and his father, Herring turned the items over to police.

**{¶ 11}** A Cleveland police firearms examiner test-fired the gun turned in by Herring and after considerable analysis determined that the casing found in the deli parking lot had been fired from the gun turned over by Herring. Further, the county coroner's office found Group O blood on Davis's right shoe and the right sleeve of his sweatsuit. However, both Davis and Perkins had Group O blood. Yellow stains on the sweatsuit's right shoulder and left leg could not be identified as blood, but a stain on the right leg tested positive for "human protein."

**{¶ 12}** Amy's husband, David, identified the car as Amy's and testified that his wife always wore a custom-made engagement wedding ring and a woman's Rolex watch. He further testified that the jewelry has been missing since Amy's death.

**{¶ 13}** Davis was ultimately charged on four counts. Counts One and Two charged aggravated murder under R.C. 2903.01(A) and (B). Each count carried three felony-murder capital specifications--kidnapping, aggravated robbery and rape/attempted rape. Davis was also charged separately with kidnapping and aggravated robbery. The jury convicted Davis of all counts listed above and all specifications thereto and recommended death sentences on Counts One and Two. The trial court sentenced Davis to death and ordered him held in solitary confinement on the twenty-sixth day of each month until his execution. The court of appeals affirmed the convictions and the sentence except for the solitary confinement provision.

**{¶ 14}** The cause is now before this court upon an appeal as of right.

———————————

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, *Frank Gasper* and *Diane Smilanick*, Assistant Prosecuting Attorneys, for appellee.

*David L. Doughten* and *John P. Parker*, for appellant.

———————————

**COOK, J.**

**{¶ 15}** Davis has presented this court with sixteen propositions of law pertaining to both the guilt and sentencing phases of his trial. Pursuant to the mandate of R.C. 2929.05(A), we have considered each of appellant's propositions of law and have reviewed the sentence for appropriateness and proportionality.

**{¶ 16}** We have previously held that R.C. 2929.05 does not require this court to address and discuss, in opinion form, each and every proposition of law raised in a capital case. See, *e.g.*, *State v. Allen* (1995), 73 Ohio St.3d 626, 628,

653 N.E.2d 675, 680; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 3, 520 N.E.2d 568, 570. Accordingly, we continue to adhere to our view on this issue and address only those issues that warrant discussion. For the following reasons, we affirm the court of appeals' judgment and uphold Davis's death sentence.

I

The Guilt Phase

A

*Venue/Pre-trial Publicity*

{¶ 17} The critical issue in Davis's first proposition of law is whether the trial court's refusal to change venue violated Davis's fair trial rights. In order to safeguard the fair trial rights of a defendant, a trial court can change venue "when it appears that a fair and impartial trial cannot be held" in that court. Crim.R. 18; R.C. 2901.12(K). In *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304, 313, we reaffirmed our position that "'"[a] change of venue rests largely in the discretion of the trial court, and * * * appellate courts should not disturb the trial court's [venue] ruling * * * unless it is clearly shown that the trial court has abused its discretion."'" (Citing *State v. Maurer* [1984], 15 Ohio St.3d 239, 250, 15 OBR 379, 388-389, 473 N.E.2d 768, 780, quoting *State v. Fairbanks* [1972] 32 Ohio St.2d 34, 37, 61 O.O.2d 241, 243, 289 N.E.2d 352, 355.)

{¶ 18} Davis asserts that constant and excessive prejudicial media coverage before and during his trial made it impossible to seat an impartial jury, in spite of the trial court's precautions and efforts during voir dire. The majority of the publicity about this case was disseminated in November and December 1991. The trial did not take place until May 1992. Compare *State v. Landrum* (1990), 53 Ohio St.3d 107, 559 N.E.2d 710 (delay of trial to February from September arraignment found to have helped dissipate any effects from the pretrial publicity). While newspaper articles did reference Perkins's murder following a similar incident in

March 1992, two months prior to trial, the articles mentioned the murder only briefly, and with no details.

{¶ 19} Pretrial print and electronic media coverage of the crime, while significant, did not act to deprive Davis of a fair trial. In *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 262, 357 N.E.2d 1035, 1051, we concluded that "a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." The transcript of voir dire indicates that publicity in this case, while significant, was not pervasive. Moreover, the trial court took substantial measures to ensure that pretrial publicity did not prejudice Davis's right to a fair trial.

{¶ 20} The trial court individually questioned over sixty veniremen and all but a few were queried as to the impact of pretrial publicity. While a sizable majority knew at least some details of the crime, ten knew nothing about the crime at all, and another eight had only vague, sketchy knowledge. The trial court readily excused those in the venire who had formed fixed opinions or were otherwise unsuitable. As such, the trial jury was not tainted by excessive exposure to pretrial publicity. In support of this conclusion, the record shows that the defense made only four challenges for cause and waived half of its peremptory challenges. Cf. *Murphy v. Florida* (1976), 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589, 596; and *State v. Thompson* (1987), 33 Ohio St.3d 1, 5, 514 N.E.2d 407, 413.

{¶ 21} Davis also maintains that there was "continuous" media coverage during voir dire. However, the record does not show the content or amount of such coverage at that time. Moreover, the court instructed all veniremen at the outset not to read, watch, or listen to any media accounts of the trial until being dismissed from the case, and there is no evidence that anyone disobeyed this warning.

{¶ 22} In light of the foregoing, we conclude that the media coverage surrounding this case was not so pervasive and sensational as to preclude a fair trial in Cuyahoga County.

**{¶ 23}** In addition to the general publicity issue, Davis also asserts that publication by the media of his criminal record, along with information "highly probative of his guilt," was enough to create a presumption of prejudice. However, this claim ignores the mandate of *Murphy v. Florida*, which held that pretrial publicity about a defendant's criminal record does not create an automatic presumption of prejudice. *Murphy*, 421 U.S. at 798, 95 S.Ct. at 2035, 44 L.Ed.2d at 593-594.

**{¶ 24}** Davis's first proposition of law is overruled.

B

*Pretrial Lineups*

**{¶ 25}** Davis's second proposition of law similarly lacks merit. He proposes that we rule that the trial court erred in failing to suppress the identification testimony of three witnesses at trial because the witnesses' identifications resulted from unduly suggestive lineups and were not otherwise reliable.

**{¶ 26}** Mattie Baker, Nancy Brown, and Diane Tomc, who saw Davis in downtown Cleveland on November 26, around 7:45 in the vicinity of the parking lot where the abduction occurred, all identified Davis in lineups as the man they saw on November 26, 1991.

**{¶ 27}** When a witness has been confronted with a suspect before trial, due process requires a court to suppress an identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances. *State v. Waddy* (1992), 63 Ohio St.3d 424, 438, 588 N.E.2d 819, 830-831, citing *Manson v. Brathwaite* (1977), 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140, 155, and *Neil v. Biggers* (1972), 409 U.S 188, 196-198, 93 S.Ct. 375, 381-382, 34 L.Ed.2d 401, 410-411. However, no due process violation will be found where an identification does not stem from an impermissibly suggestive confrontation, but is instead the

result of observations at the time of the crime. *Coleman v. Alabama* (1970), 399 U.S. 1, 5-6, 90 S.Ct. 1999, 2001, 26 L.Ed.2d 387, 394.

{¶ 28} The day after the murder occurred, Baker and Brown picked Davis out of a lineup and identified him as the man they saw with Amy Perkins. A week later, Tomc also picked Davis out of a lineup as the man she saw near the crime scene shortly before the kidnapping. Davis claims these lineups were unnecessarily suggestive, because the other participants looked so unlike him that he stood out.

{¶ 29} On both November 27 and December 3, Davis was lined up with five other black males. All, including Davis, had facial hair; however, the complexions of the men varied and none had a bushy, curly hairstyle like Davis's.

{¶ 30} A defendant in a lineup need not be surrounded by people nearly identical in appearance. *New York v. Chipp* (1990), 75 N.Y.2d 327, 336, 553 N.Y.S.2d 72, 77, 552 N.E.2d 608, 613. "[E]ven * * * significant dissimilarities of appearance or dress" will not necessarily deny due process. 1 LaFave & Israel, Criminal Procedure (1984) 587, Section 7.4.

{¶ 31} Davis also argues that he was the only one in either lineup with jail slippers on his feet and no street clothes under his jail uniform. However, this did not affect the integrity of the lineups. Baker, Tomc, and Detective Leo Allen of the Cleveland Police Department testified that the participants' street clothes were not visible under the jail uniforms. Their footwear may have been visible, but the witnesses were told to look at faces only. Baker thought all the participants "had on basically the same slippers," and Tomc could not recall whether they had any footwear on.

{¶ 32} Even if we were to accept Davis's contention that the lineups were unnecessarily suggestive, the identifications were nonetheless reliable under the totality of the circumstances. In order to determine the reliability of the identification, we must consider (1) the witness's opportunity to view the defendant at the time of the incident, (2) the witness's degree of attention, (3) the accuracy of

8

the witness's prior description, (4) the witness's certainty when identifying the suspect at the time of the confrontation, and (5) the length of time elapsed between the crime and the identification. *Waddy,* 69 Ohio St.3d at 439, 588 N.E.2d at 831, citing *Neil*, 409 U.S. at 199-200, 93 S.Ct. at 382, 34 L.Ed.2d at 411.

{¶ 33} Baker knew Davis, having seen him more than twenty times before. While she testified at trial that she saw Davis on television before the lineup, at the voir dire of identification witnesses she did not so testify, and Davis did not renew his motion to suppress in light of Baker's trial testimony. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 45, 630 N.E.2d 339, 348. Davis also argues that Detective Allen tainted Baker's identification by asking her "to identify Wiley Davis in a lineup." However, Baker testified that she did not recall Allen's exact words, and even if Allen did use Wiley Davis's name, Baker recognized Davis only because of his employment at the restaurant she frequented and did not know him by name. Even assuming Allen used Davis's name, that would not affect the reliability of Baker's identification.

{¶ 34} Brown's identification is also reliable. She had a good opportunity to see the driver as the car rolled past her, close at hand and "slow enough for me to get a good look * * * ." Her attention was undivided, and her identification was positive. While Davis claims Brown's identification was tainted by news coverage, Brown testified that she did not see any photos of Davis in the news media before the lineup.

{¶ 35} Of the three identifications, Tomc's is the most problematic, however, her testimony at trial merely placed Davis near, but not at, the parking lot about half an hour before Baker placed him in the car with the victim. Independent of Tomc's testimony, the state produced overwhelming proof that Davis was Perkins's killer. Accordingly, even assuming error in the trial court's admission of Tomc's identification testimony, we would be unable to conclude that such error compels a reversal of Davis's conviction. *State v. Williams* (1983), 6 Ohio St.3d

281, 290, 6 OBR 345, 353, 452 N.E.2d 1323, 1333, citing *Harrington v. California* (1969), 395 U.S. 250, 254, 89 S.Ct. 1726, 1728-1729, 23 L.Ed.2d 284, 287-288.

{¶ 36} Davis's second proposition of law is overruled.

C

*Attempted Rape*

{¶ 37} We find merit in Davis's third proposition of law, in which he contends that the state failed to prove him guilty of the attempted rape specifications.

{¶ 38} Attempted rape requires that the actor (1) intend to compel submission to sexual conduct by force or threat, and (2) commit some act that "convincingly demonstrate[s]'" such intent. See *State v. Heinish* (1990), 50 Ohio St.3d 231, 238-239, 553 N.E.2d 1026, 1035, quoting *State v. Woods* (1976), 48 Ohio St.2d 127, 132, 2 O.O.3d 289, 292, 357 N.E.2d 1059, 1063.

{¶ 39} The only evidence supporting the attempted rape specifications is Gwendolyn Brice's testimony that just before Davis shot Perkins, Brice saw Perkins trying to push Davis away, acting as if "she [Perkins] didn't want to do [some]thing," the fact that Perkins was nude when Davis dumped her from the car, and the forensic evidence showing that there were possible finger marks on Perkins's left thigh.

{¶ 40} While removing the victim's clothing can amount to a "substantial step" toward the commission of rape, *State v. Powell* (1990), 49 Ohio St.3d 255, 261, 552 N.E.2d 191, 198, a defendant cannot be convicted of attempted rape *solely* on evidence that he removed the victim's clothing. There must be evidence indicating purpose to commit rape instead of some other sex offense, such as gross sexual imposition, R.C. 2907.05, which requires only sexual *contact*. See *Heinish,* 50 Ohio St.3d at 238-239, 553 N.E.2d at 1035. In *Heinish,* this court found that a victim's partial nudity combined with saliva on the crotch of her blue jeans was insufficient to show intent to rape. Justice Wright, writing for a majority of the

10

*Heinish* court, commented that while "[o]ne may be tempted to speculate and indeed strongly suspect that crimes other than murder were committed * * *, we would be remiss in performing our duties of review if we let the attempted rape conviction stand." *Id.* at 239, 553 N.E.2d at 1035.

{¶ 41} Brice's testimony that Perkins seemed to be trying to push Davis away from her shortly before the shooting occurred is not strongly corroborative of Davis's intent to accomplish sexual conduct. Further, there was no testimony that imprints suggestive of finger marks left on Perkins's thigh were indicative of an attempt to compel sexual conduct as opposed to sexual contact. Contrast *State v. Scudder* (1994), 71 Ohio St.3d 263, 641 N.E.2d 524 (where, along with other evidence indicative of the defendant's intent to commit rape, the court found that bloody hand marks on the victim's thighs were in such a pattern so as to indicate that the killer had tried to force the victim's legs apart).

{¶ 42} Based on the evidence presented, we find there was insufficient evidence to prove beyond a reasonable doubt that Davis attempted to rape Perkins. Accordingly, we must reverse the attempted rape specifications.

{¶ 43} Despite our reversal of Davis's attempted rape specifications, we are not required to vacate his death sentence. We must independently reweigh the remaining aggravating circumstances against the mitigating factors. See *Clemons v. Mississippi* (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725. Accordingly, we sustain Davis's third proposition of law, reverse the court of appeals with respect to the attempted rape specifications, and exclude those specifications from our independent review of aggravating circumstances and mitigating factors.

### D

### *Aggravated Robbery*

{¶ 44} Davis claims in his fourth proposition that there was insufficient evidence of aggravated robbery to support a conviction. R.C. 2911.01(A)(2) states,

"No person, in attempting or committing a theft offense, * * * shall * * * [i]nflict or attempt to inflict serious physical harm on another." Davis argues that the prosecution failed to prove a "theft offense" under R.C. 2913.02. This claim lacks merit.

{¶ 45} Amy Perkins's husband, David, testified that Amy "habitually" wore "a combination engagement and wedding ring" consisting of twelve small diamonds and a two-karat marquise, "and she also habitually wore a Rolex watch * * * ." David specifically said Amy "wore the items every day." Thus, even though David could not testify from personal knowledge that Amy wore the items on the day she was murdered, a jury could reasonably infer that she did.

{¶ 46} Nancy Brown, who saw Amy immediately after she was pushed out of the car, specifically testified that Amy had "no jewelry, no clothing, nothing on." David Perkins testified that the watch and ring were "missing" and he never saw them again. Amy's belongings which were found in the Toyota "appeared to have been rifled through." The majority of the evidence supporting Davis's conviction of a theft offense is circumstantial; however, circumstantial evidence inherently possesses the same value as direct evidence. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. Such evidence, when coupled with the circumstances of the kidnapping and murder, is sufficient for a rational jury to find beyond a reasonable doubt that a theft offense took place. See *State v. Allen* (1995), 73 Ohio St.3d 626, 632, 653 N.E.2d 675, 683.

{¶ 47} Davis's fourth proposition of law is overruled.

II

Penalty Phase

A

*Jury Instructions*

{¶ 48} In his eleventh proposition of law, Davis argues that the trial court improperly gave the jury an "acquittal first" instruction during the penalty phase of

12

the trial. In support of this proposition, Davis cites *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, wherein this court outlined the progression that a jury must follow when the trial court charges it on the indicted offense as well as a lesser included offense or offenses:

"A jury must unanimously agree that the defendant is guilty of a particular criminal offense before returning a verdict of guilty on that offense. If a jury is unable to agree unanimously that the defendant is guilty of a particular offense, it may proceed to consider a lesser included offense upon which evidence has been presented. The jury is not required to determine unanimously that the defendant is not guilty of the crime charged before it may consider a lesser included offense." *Id.* at paragraph three of the syllabus.

{¶ 49} *Thomas* dealt with jury instructions regarding a guilt determination and therefore is not directly applicable to the death penalty versus life imprisonment recommendation that a jury is required to make in the penalty phase of a capital case. Nevertheless, Davis's argument that a "proper [jury] instruction would have informed the jury that had the state failed to prove the princip[al] charge or had the jury been unable to agree on whether the state had failed to prove the elements of the greater offense[,] it could have considered the lesser charge" raises an issue identical to that which formed the basis of our recent decision to overturn a death sentence in *State v. Brooks* (1996), 75 Ohio St.3d 148, 661 N.E.2d 1030. Because the pertinent jury instructions given in this case are distinguishable from those given in *Brooks*, however, this case warrants dissimilar disposition.

{¶ 50} In *Brooks*, the trial court charged the jury that "'[y]ou are now required to determine *unanimously* that the death penalty *is inappropriate before* you can consider a life sentence.'" (Emphasis added.) *Id.* at 159, 661 N.E.2d at 1040. As a result of this instruction, the jury was required to issue a death sentence recommendation unless each juror was convinced that the death penalty was

inappropriate. *Id.* at 160, 661 N.E.2d at 1041. The *Brooks* court found error in the trial court's instruction because it was in direct conflict with R.C. 2929.03(D)(2).

**{¶ 51}** The *Brooks* court concluded that the erroneous jury instruction was prejudicial to the defendant because it gave jurors the impression that a single juror could not prevent a death penalty recommendation on his or her conviction that the aggravating circumstances in a case do not outweigh the mitigating factors.

**{¶ 52}** Davis cites the following portion of the trial court's jury instructions in support of his argument:

"On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence, the unsworn statement of Wiley Davis, Jr. and the arguments of counsel, you find that the state of Ohio failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant, Wiley Davis, Jr., was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision; that is, you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors.

"In this event you will then proceed to determine which of the two possible life imprisonment sentences to recommend to the Court."

**{¶ 53}** However, Davis has omitted the first portion of the trial court's charge, which states:

"*If all twelve members of the jury* find by proof beyond a reasonable doubt that the aggravating circumstances which Wiley Davis, Jr. was found guilty of committing outweigh the mitigating factors, if any, then you must return such finding for the Court." (Emphasis added.)

**{¶ 54}** When read as a whole, the trial court's instruction effectively informed the jury that a death penalty recommendation could be returned only after a unanimous vote that the aggravating circumstances that Davis was found guilty

14

of committing outweigh the mitigating factor presented in the case beyond a reasonable doubt.  Moreover, unlike the instructions given in *Brooks*, the jury was not instructed that it was required to *unanimously* determine that the death penalty was inappropriate before it could consider the life sentence alternatives. Nevertheless, it cannot be disputed that the jury instruction given in this case lacks the clarity of the model instruction contemplated in *Brooks*, which urges trial courts to underscore a solitary juror's ability to prevent a death penalty recommendation.

{¶ 55} In the instant case, in addition to giving the contested charge, the trial court read the verdict forms to the jury and thereafter charged it that all twelve jurors were required to be in agreement before returning any of the verdicts.  The court also instructed the jury as follows:

"Now, your initial conduct upon entering the jury room, again, is a matter of importance.  You should consult with each other; consider each other's views, and deliberate with an objective of reaching an agreement, if you can do so, without doing violence to your individual conscience and good judgment.

"You should do so only after a discussion and a consideration of the case with your fellow jurors.

"Remember, each of you is equal in the jury room, and you shouldn't hesitate to change your opinion if convinced by your fellow jurors that you are wrong.

"However, do not surrender any honest conviction in order to be congenial, or to reach a verdict solely of the belief of the other jurors."        Upon review of all of the instructions given in this case, it is clear that the jury was adequately informed that unanimity was required to return a death penalty recommendation. Each juror was made aware that he or she could prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors -- an essential fact which sets this case apart from *Brooks* .

**{¶ 56}** Because Davis has failed to demonstrate that his right to a fair trial was prejudiced as a result of the contested jury instruction, we overrule his eleventh proposition of law.

**{¶ 57}** In his fifth proposition of law, Davis contends that, in order to convict on the R.C.2929.04(A)(7) specifications, the jury had to find *unanimously* either that Davis was the principal offender or that he killed with prior calculation and design. Davis claims error because the jury was not so instructed; however, Davis did not request any such instruction at trial. Under the plain error rule, Davis can prevail only by showing that "but for the [alleged] error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1979), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

**{¶ 58}** We find that the alleged error here was not outcome-determinative. The jury convicted Davis of aggravated murder on Count One of the indictment. To do so, the jury had to unanimously find prior calculation and design. Further, because there was no evidence produced at trial that a second actor participated in committing the aggravated murder, the jury's unanimous verdict necessarily includes a finding that Davis was the principal offender. See *State v. Woodard* (1993), 68 Ohio St.3d 70, 74-75, 623 N.E.2d 75, 78-79.

**{¶ 59}** Count Two of the indictment charged Davis with killing Perkins in the course of committing, attempting, or fleeing the commission or attempted commission of "Kidnapping *and/or* Aggravated Robbery *and/or* Rape." (Emphasis added.) Davis contends that the jury had to unanimously determine which felony had been committed, and should have been so instructed.

**{¶ 60}** Again, Davis did not request such an instruction, waiving this issue absent plain error. We find that the alleged error was not outcome-determinative. Although Count Two was worded disjunctively, both it and Count One carried a separate felony-murder specification for each of the felonies alleged. The jury convicted Davis of each specification individually. The jury also separately

16

convicted Davis of kidnapping (Count Three) and aggravated robbery (Count Four). Because the jury made a separate, unanimous finding of guilt as to each of the predicate felonies, there is no plain error.

{¶ 61} Davis's fifth proposition of law is overruled.

B

*Prosecutorial Misconduct*

{¶ 62} In his seventh proposition of law, Davis maintains that three comments in the prosecutor's penalty-phase closing argument were improper. He argues that the prosecutor's reference to the defendant's unsworn statement, an appeal to the jury's sense of outrage, and an argument on nonstatutory aggravating circumstances were all improper. However, the only comment to which Davis objected at trial was the prosecutor's reference that Amy Perkins "died a horrible death," was dumped onto the street "like garbage * * * with no clothes on, for anybody to take a look at her," and had a large head wound that steamed in the cold air.

{¶ 63} While we find that most of the disputed statement was fair comment on the evidence and within the bounds of the prosecutor's wide latitude in closing argument, the reference to the steaming head wound is arguably improper because it tended to focus attention on the grotesque aspects of the crime. Cf. *Thompson*, 33 Ohio St.3d at 14-15, 514 N.E.2d at 420; *State v. Keenan* (1993), 66 Ohio St.3d 402, 407-408, 613 N.E.2d 203, 208. However, the prosecutor's improper comment was isolated and did not deprive the defendant of a fair trial. Therefore, it does not constitute reversible error. See *Smith v. Phillips* (1982), 455 U.S. 209, 220, 102 S.Ct. 940, 947, 71 L.Ed.2d 78, 88, fn. 10.

{¶ 64} Because Davis failed to object at trial to the following comments, he waived any error unless he can demonstrate plain error. However, we need not invoke a plain error analysis, as neither of the complained of prosecutorial comments constituted misconduct.

{¶ 65} Davis first complains of the prosecutor's comment that Davis's unsworn statement "was not subject to cross-examination." Davis claims that such a comment is forbidden by *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph two of the syllabus.

{¶ 66} *DePew* holds that "the prosecutor may comment that the defendant's statement has not been made under oath * * *, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." *Id*. *DePew* limits only prosecutorial comment on the lack of an oath. In contrast, prosecutorial comment on the lack of cross-examination is consistent with *DePew*. See *State v. Murphy* (1992), 65 Ohio St.3d 554, 579, 605 N.E.2d 884, 904.

{¶ 67} Davis additionally bases an allegation of misconduct on the prosecutor's comment that "[t]he Judge is going to instruct you that you must consider the nature of the offense, the history, character, and background of the offender." Davis claims that the prosecutor could not discuss these issues, since the defense did not raise them in mitigation. *DePew*, *supra*.

{¶ 68} However, under R.C. 2929.04(B) the jury must consider the nature and circumstances of the offense and the offender's history, character, and background, whether the defense raises these issues or not. Therefore, it is proper for a prosecutor to discuss them. *State v. Gumm* (1995), 73 Ohio St.3d 413, 416-423, 653 N.E.2d 253, 259-264. As such, we find that the prosecutor here did not try to mislead the jury into considering and weighing these factors as aggravating circumstances, see *id*. at 422, 653 N.E.2d at 263-264, and overrule Davis's seventh proposition of law.

C

*Merger*

{¶ 69} In his fifteenth proposition of law, Davis contends that the trial court erred by failing to merge the two aggravated murder counts before submitting the

question of penalty to the jury. However, pursuant to *State v. Poindexter* (1988), 36 Ohio St.3d 1, 5, 520 N.E.2d 568, 572, this is not required.

{¶ 70} We conclude that the trial judge should have merged the two counts before finally sentencing Davis. See *State v. Huertas* (1990), 51 Ohio St.3d 22, 28, 553 N.E.2d 1058, 1066. Accordingly, we merge the two convictions so that a single death sentence remains. *State v. Hawkins* (1993), 66 Ohio St.3d 339, 346, 612 N.E.2d 1227, 1232.

{¶ 71} Because the error in sentencing was merely procedural and did not involve any substantial right, it constitutes harmless error. *State v. Brown* (1988), 38 Ohio St.3d 305, 317-318, 528 N.E.2d 523, 538-539. Accordingly, we merge Davis's aggravated murder convictions and overrule Davis's fifteenth proposition of law in all other respects.

III

Sentencing Opinion

{¶ 72} In his fourteenth proposition, Davis contends that the trial court's sentencing analysis was flawed. However, errors in the sentencing opinion can be corrected by this court's independent reweighing of aggravation and mitigation. See., *e.g.*, *State v. Fox* (1994), 69 Ohio St.3d 183, 191-192, 631 N.E.2d 124, 131.

{¶ 73} Davis argues that the opinion was factually inaccurate. The opinion states, "Once [Davis] had isolated his innocent victim, he moved with practiced precision." It continues with the statement that Davis "made Amy Perkins beg and plead for her life." While these statements are not supported by the record, this court's independent review can correct that problem by not relying on them. *Allen*, 73 Ohio St.3d at 643, 653 N.E.2d at 690.

{¶ 74} Further, while we find that the opinion conveys a tone of moral outrage, the opinion's substance does not support Davis's inference that the trial court considered and weighed the nature and circumstances as a nonstatutory aggravating circumstance. Therefore, this proposition is overruled.

IV

Ineffective Assistance of Counsel

**{¶ 75}** Davis claims in his thirteenth proposition that his trial counsel was ineffective because counsel failed to preserve the claims presented in his fifth, sixth, seventh, ninth, eleventh, and twelfth propositions.

**{¶ 76}** We find that Davis's counsel did not perform deficiently. The disputed propositions either did not constitute error or were harmless. Further, given the strong evidence of guilt and the inconsequential mitigation, we find that these alleged errors are not prejudicial under *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, because they do not undermine any confidence in the reliability of the result. There can be no claim "that the decision reached would reasonably likely have been different absent the [alleged] errors." *Id.* at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699; *State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373, 380.

**{¶ 77}** Davis's thirteenth proposition is overruled.

V

Independent Sentence Assessment

A

*Aggravating Circumstances v. Mitigating Factor*

**{¶ 78}** Having found that the evidence shows beyond a reasonable doubt that Davis committed the murder while committing or attempting to commit aggravated robbery and kidnapping, we now turn to our independent assessment of whether the aggravating circumstances Davis was found guilty of committing outweigh the mitigating factor adduced by Davis. We determine that the aggravating circumstances outweigh the mitigating factor presented beyond a reasonable doubt.

**{¶ 79}** The defense essentially proffered no mitigating factors at all, except brief pleas for mercy by Davis, his wife, his sister, and his employer. Davis's entire

unsworn statement was: "I am a little nervous right now, but I respect you all and you all's decision, and I just beg you all, spare my life.

{¶ 80} "I understand what the Perkins family is going through, but my family is going through it too. That's all I got to say."

{¶ 81} Davis's counsel expressly disclaimed reliance on the specific mitigating factors in R.C. 2929.04(B)(1) through (6) and relied solely on R.C. 2929.04(B)(7)—"Any other factors that are relevant to * * * whether the offender should be sentenced to death." In very brief closing argument, counsel asked for mercy, emphasized the jury's "tremendous" responsibility, and asserted that "[t]here must be something there worth saving" because Davis's employer had testified for him in both phases of trial, whereas "[m]ost employers would distance themselves * * * from someone charged with a crime." The defense was unable to produce anything more, despite an extensive investigation that included a thorough search for mitigating factors.

{¶ 82} While pleas for mercy made by Davis's wife, sister, and employer deserve some consideration, see *State v. Webb* (1994), 70 Ohio St.3d 325, 342-343, 638 N.E.2d 1023, 1038, the mercy pleas practically stand alone as mitigating evidence. There is little or no mitigation in the nature and circumstances of the offense. Further, the defense presented no evidence of Davis's history, his character, or background.

{¶ 83} Davis was convicted of two valid death specifications: kidnapping and aggravated robbery. Because these outweigh the mitigating factor beyond a reasonable doubt, we find that the death sentence is appropriate.

B

*Proportionality*

{¶ 84} We also conclude that the penalty imposed is proportionate when compared with similar capital cases. This court has upheld death sentences in two cases involving kidnapping and aggravated robbery See *State v. Roe* (1989), 41

Ohio St.3d 18, 28-29, 535 N.E.2d 1351, 1363, and *State v. Cook* (1992), 65 Ohio St.3d 516, 530-531, 605 N.E.2d 70, 85.  Moreover, the court has often upheld death sentences where only one of these aggravating circumstances existed.  See, e.g., *State v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267, and *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 652 N.E.2d 710 (kidnapping); *State v. Clark* (1988), 38 Ohio St.3d 252, 527 N.E.2d 844, *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, *State  v. Allen, supra* (aggravated robbery).  Thus, the sentence is proportionate to those imposed in similar cases.

VI

Conclusion

**{¶ 85}** We reverse the judgment of the court of appeals with respect to Davis's conviction of the attempted rape specifications and the merger of Davis's aggravated murder convictions and affirm its judgment and the sentence imposed in all other respects.

*Judgment affirmed in part*

*and reversed in part.*

MOYER, C.J., F.E. SWEENEY, PFEIFER AND STRATTON, JJ., CONCUR.

DOUGLAS AND RESNICK, JJ., CONCUR IN JUDGMENT ONLY.

_____

APPENDIX

**{¶ 86}** Proposition of Law No. 1: "The trial court must grant a change of venue where the extensive pretrial publicity renders it impossible for the defendant to obtain a fair trial."

**{¶ 87}** Proposition of Law No. 2: "A conviction which arises from an unduly suggestive lineup must be overturned as such a conviction is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution."

**{¶ 88}** Proposition of Law No. 3: "A criminal conviction for attempted rape may not be sustained where the evidence supporting the charge does not constitute proof beyond a reasonable doubt."

**{¶ 89}** Proposition of Law No. 4: "In order to sustain a conviction of aggravated robbery and a corresponding capital specification, the jury must find beyond a reasonable doubt as to each and every element of R.C. §2911.01 and R.C. §2929.04(A)(7)."

**{¶ 90}** Proposition of Law No. 5: "Failure to find an essential element of a capital specification results in the invalidation of that specification."

{¶ 91} Proposition of Law No. 6: "The injection of irrelevant trial phase evidence into the penalty phase deliberation violates the integrity of the verdict."

{¶ 92} Proposition of Law No. 7: "During the closing argument of the penalty phase, the prosecutor may not improperly comment on the defendant's unsworn statement, appeal to the jury's sense of outrage, or argue non-statutory aggravating factors."

{¶ 93} Proposition of Law No. 8: "The trial court and the prosecutor may not instruct the jury that their decision in the penalty phase is a recommendation. This instruction is a violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution."

{¶ 94} Proposition of Law No. 9: "Where the trial court improperly instructs the jury that the specifications of the indictment are in fact the aggravating circumstances, the resultant sentence of death is improper because the constitutionally required narrowing has been violated."

{¶ 95} Proposition of Law No. 10: "When requested, the trial court must provide the jury with an instruction regarding residual doubt during the penalty phase of a capital trial."

{¶ 96} Proposition of Law No. 11: "The trial court may not provide the jury with an 'acquittal first' instruction during the penalty phase of a capital trial."

{¶ 97} Proposition of Law No. 12: "The trial court must provide accurate penalty phase instructions. Where inaccurate instructions misguide the jury as to their duties under the law, the resultant sentence is unreliable and violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution."

{¶ 98} Proposition of Law No. 13: "Where trial counsel fails to object to erroneous jury instructions and improper comments of the prosecutor, the defendant is denied effective assistance of counsel where there is a reasonable

probability that the death sentence would not have been recommended had the objections been proffered."

{¶ 99} Proposition of Law No. 14: "A death sentence may not be sustained where the mitigating factors presented at trial outweigh the statutory aggravating factors present in the case."

{¶ 100} Proposition of Law No. 15: "The trial court may not sentence a defendant to death two times for a single homicide. This double sentence violates R.C. §2941.25(A) and the Double Jeopardy Clause contained in Section 10, Article I of the Ohio Constitution and the Fifth Amendment to the United States Constitution."

{¶ 101} Proposition of Law No. 16: "Imposition of the death sentence violates the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I, of the Ohio Constitution.

{¶ 102} "A. The death penalty authorized by the Ohio Revised Code deprives capitally-charged defendants of their lives without due process of law, denies equal protection and imposes cruel and unusual punishment in violation of the Ohio and United States Constitutions.

{¶ 103} "B. R.C. §2929.022, §2929.03, and §2929.04 violate the accused's rights to effective assistance of counsel and to a trial before an impartial jury, as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Sections 9, 10, and 16, Article [I] of the Ohio Constitution.

{¶ 104} "C. R.C. §2929.03, §2929.04 and §2929.022 violate the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution by failing to provide adequate guidelines for deliberation, leaving the jury without proper guidelines in balancing the aggravating circumstances and mitigating factors.

{¶ 105} "D. R.C. §2929.022, §2929.03 and §2929.04 and Crim. R. 11(C)(3) place an unconstitutional burden on the accused's right to a jury trial under

the Sixth, and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution and his rights to be free from compulsory self-incrimination under the Fifth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

{¶ 106} "E.   R.C. §2929.03 fails to provide a meaningful basis for distinguishing between life and death sentences, as it does not explicitly require the jury, when it recommends life imprisonment, to specify the mitigating factors found, or to identify its reasons for such sentence.  This denies the accused his rights under R.C. §2929.03(A), the Ohio Constitution and the Federal Constitution.

{¶ 107} "F.  R.C. §2929.021, §2929.03 and §2929.05 fail to assure adequate appellate analysis of arbitrariness, excessiveness and disproportionality of death sentences and the Ohio Supreme Court fails to engage in a level of analysis that ensures against arbitrary death sentencing.

{¶ 108} "G.   The appellate review provision of R.C. §2929.05 fails to specifically require inquiry and findings regarding arbitrariness, passion or prejudice, and thus is constitutionally inadequate under the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16 [of Article I] of the Ohio Constitution.

{¶ 109} "H.   The Ohio death penalty statute impermissibly mandates imposition of the death penalty and precludes a mercy option in the absence of mitigating evidence or when aggravating circumstances outweigh mitigating factors.  The statute also fails to require a determination that death is the appropriate punishment.

{¶ 110} "I.  R.C. §2929.03, §2929.04 and §2929.05 violate the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution by failing to require the jury to decide the appropriateness of the death penalty.

{¶ 111} "J.  The Ohio death penalty scheme permits imposition of the death penalty on a less than adequate showing of culpability by failing to require a conscious desire to kill, premeditation, or deliberation as the culpable mental state.

{¶ 112} "K.  The Ohio 'beyond a reasonable doubt' standard of proof fails to meet the requirement for higher reliability for the guilt determination phase of a capital case.

{¶ 113} "L.  The aggravating circumstance the accused is charged with committing, R.C. §2929.04(A)(7), is constitutionally invalid when used to aggravate R.C. §2903.01(B), aggravated murder.

{¶ 114} "M.  R.C. §2929.03, §2929.04 and §2929.05 violate the Eighth and Fourteenth Amendments to the United States Constitution and Article [I], Sections 9 and 16 of the Ohio Constitution by failing to properly allocate the burden of proof during [the] mitigation phase of trial."