{¶ 44} Because I am convinced that the trial court did not abuse its discretion in excluding from evidence the allegedly comparable materials or in refusing to grant a mistrial following juror exposure to media reports, I must respectfully dissent.
{¶ 45} In her first assignment of error, Dute argues that the trial court erred by denying her motion to introduce comparable materials, which included three videotapes. Dute's argument before the trial court and on appeal that the three proffered videotapes[5] had been "found by a Hamilton County jury not to be obscene" lacks foundation in the record. Dute proffered the three videotapes, as well as a transcript of the trial proceedings in State of Ohio v. Elyse Metcalf.[6]
Metcalf had been charged with three counts of pandering obscenity in connection with her sale of the three videotapes to undercover officers.[7]
{¶ 46} As with most criminal trials, those who review the record following an acquittal typically are not able to determine why a jury chose not to find the defendant guilty. Because jury deliberations are secret, even the judge who presided over the trial or the lawyers who tried the case cannot say for certain why the jury acquitted the defendant. "As a general rule, no one — including the judge presiding at trial — has a `right to know' how a jury, or any individual juror, has deliberated or how a decision was reached by a jury or juror.'"[8]
{¶ 47} Having reviewed the transcript of the Metcalf trial, I cannot conclude that it demonstrates that the jury acquitted Metcalf based upon a finding that the videotapes at issue were not obscene. In Metcalf's trial, defense counsel made much of the fact that Metcalf had not actually watched the three videotapes that were the subject of her prosecution, and that Metcalf, who was "not hiding anything," did not intend to violate the law. Counsel argued that Metcalf would have had to know the character of the videotapes — she would have had to know that the material in the videotapes was obscene.
{¶ 48} Metcalf's defense counsel also argued that one of the undercover police officers had entered Metcalf's store and, within a few minutes, "seemed to get enough trust out of [Metcalf] to have her help him find the tape that he wanted to give for his father * * *. * * * And then he further lured her into the idea of feeling comfortable with him so that he could ask her, do you have a particular tape? And she said no. Well, can you get it for me? And never meeting him before, in his ability to be able to get her to feel comfortable, she went ahead and paid out of her own money, called the national distributor and asked, do you have a particular tape and got it."
{¶ 49} One might speculate that the jurors were swayed by counsel's arguments that Metcalf lacked knowledge of the obscene nature of the videotapes, or that the police had "lured" her into making the sales. But that is just as speculative as Dute's argument that the Metcalf jury found the three videotapes not to be obscene. "A distinct possibility exists that the [jury's] verdicts were predicated on findings that the prosecution failed to prove any of the other elements of the offense beyond a reasonable doubt rather than that the materials were not obscene."[9]
{¶ 50} Following a review of the three videotapes proffered by Dute, a majority of this court has concluded that only one of the three videotapes, "Gangland 17," is sufficiently similar to the Dute videotapes. The majority holds that the trial court erred by excluding the videotape from evidence because it was comparable to the Dute videotapes and "had been found not to be obscene in a prior proceeding by a Hamilton County jury." While I agree that the "Gangland 17" videotape is somewhat similar to the Dute videotapes, I cannot agree that it had been found by a previous jury not to be obscene. Moreover, as the United States Supreme Court has recognized, "A judicial determination that particular matters are not obscene does not necessarily make them relevant to the determination of the obscenity of other materials, much less mandate their admission into evidence."[10]
{¶ 51} The trial court's decision to exclude evidence concerning the existence of comparable material rests within the sound discretion of the court.[11] Absent a showing of an abuse of discretion, that decision should not be disturbed on appeal. An abuse of discretion "connotes more than error of law or judgment; it implies an unreasonable, arbitrary or unconscionable attitude * * *."[12]
{¶ 52} In Hamling v. United States, the United States Supreme Court noted that the petitioners had offered into evidence at trial allegedly comparable materials, including materials that had been the subject of prior litigation and had been found to be constitutionally protected, as well as materials that were openly available on newsstands. The Supreme Court held that the trial court had not abused its discretion in refusing to admit the allegedly comparable materials into evidence:
{¶ 53} "The defendant in an obscenity prosecution, just as a defendant in any other prosecution, is entitled to an opportunity to adduce relevant, competent evidence bearing on the issues to be tried. But the availability of similar materials on the newsstands of the community does not automatically make them admissible as tending to prove the nonobscenity of the materials which the defendant is charged with circulating. As stated by the Court of Appeals, the mere fact that materials similar to the brochure at issue here `are for sale and purchased at book stores around the country does not make them witnesses of virtue.' [Citations omitted.] Or, as put by the Court of Appeals inUnited States v. Manarite [Citations omitted]: `Mere availability of similar material by itself means nothing more than that other persons are engaged in similar activities.'"[13]
{¶ 54} The availability of similar materials "does not automatically make them admissible as tending to prove the non-obscenity of the materials which the defendant is charged with circulating," and the trial court "retains considerable latitude even with admittedly relevant evidence in rejecting that which is cumulative, and in requiring that which is to be brought to the jury's attention to be done so in a manner least likely to confuse that body."[14]
{¶ 55} In this case, the trial court did not deprive Dute of her right to introduce evidence regarding the Miller obscenity test. Dute presented the testimony of Elyse Metcalf, the proprietor of a store that sold what she described as "adult material, including adult movies and sexual enhancement." Metcalf testified that sexually explicit videotapes were available for sale in Hamilton County through various stores within the county, as well as through the Internet.
{¶ 56} Because I believe that the trial court did not abuse its discretion in refusing to admit the Gangland Vol. 17 videotape into evidence, I would overrule Dute's first assignment of error.
{¶ 57} In her second assignment of error, Dute argues that the trial court erred by denying her motion for a mistrial following the media reports of her prior pandering-obscenity charge. "In the assessment of the denial of a motion for a mistrial, the standard of review for this court is whether the trial court abused its discretion."[15] "An appellate court will not disturb the exercise of that discretion absent a showing of an abuse and that the accused has suffered material prejudice."[16]
{¶ 58} In 1959, in Marshall v. United States,[17] the United States Supreme Court held that jurors who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced. In 1973, the Ohio Supreme Court seized upon this holding despite the fact that Marshall was expressly limited to the Supreme Court's exercise of supervisory power to formulate standards for enforcement of the criminal law in federal courts. In State v. Craven,[18] the Ohio Supreme Court reversed the defendant's conviction because the defendant had been prejudiced by the prosecutor's attempts to elicit testimony regarding the defendant's prior convictions, and because the prejudice to the defendant that had resulted from the jurors' exposure to a newspaper article could not have been overcome by the jurors' assurances that they had not been influenced by the article.
{¶ 59} In 1975, in Murphy v. Florida,[19] the United States Supreme Court specifically stated that its earlier decision in Marshall
was not a constitutional ruling and was, therefore, not applicable to the states through the Fourteenth Amendment to the United States Constitution. Murphy specifically rejected the "proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process."[20] Instead, the Court used a totality-of-the-circumstances test to determine whether the defendant's trial had been fundamentally unfair.[21] Murphy held that, under the totality of the circumstances, the defendant had not been denied a fair trial where members of the jury had learned from news accounts about a prior felony conviction or about certain facts about the crime with which he was charged.[22]
{¶ 60} In State v. Davis,[23] the Ohio Supreme Court recognized the United States Supreme Court's repudiation of the per se rule of prejudice. Davis had argued that publication by the media of his criminal record, along with information "highly probative of his guilt," was enough to create a presumption of prejudice. The court rejected Davis's argument, because his "claim ignores the mandate of Murphy v. Florida, which held that pretrial publicity about a defendant's criminal record does not create an automatic presumption of prejudice."[24]
{¶ 61} In this case, the majority concludes that the information contained in the news accounts was "highly prejudicial" to Dute. On appeal, Dute argues that "various local media outlets reported on the second day of trial that Mrs. Dute had a prior obscenity conviction stemming from the 1999 charges. * * * The prejudicial effect of these reports were heightened by their blatantly false suggestion that Mrs. Dute had been previously convicted of pandering obscenity. Mrs. Dute had no such conviction; the prior charges against her were dismissed in exchange for a corporate plea by AJ Specialties." Dute's claim that the media had reported that she had been convicted of the prior charge is not supported by the record or by the affidavits submitted by defense counsel.
{¶ 62} On the third day of trial, Alan Dute's lawyer, now one of Jennifer Dute's lawyers on appeal, filed an affidavit with the court alleging that, since the first day of the trial, she had viewed two television news reports and one newspaper account about the Dute case. The lawyer alleged that she had heard one television story report that "the Dutes had previously been charged with obscenity and had agreed `never to sell videos in Hamilton County again.'" The lawyer further alleged that a second television story had reported that "Mr. and Mrs. Dute have previously been charged with pandering obscenity but that the charges were dismissed in exchange for an agreement by the Dutes not to sell videos in Hamilton County." Finally, the newspaper account reported that "* * * this isn't the first time [the Dutes] have been charged with pandering obscenity. In a 2000 plea bargain, the Dutes allowed their company — AJ Specialties — to plead guilty to two counts of pandering obscenity to have the charges against each of them dismissed. They escaped potential prison time when they paid a $2,500 fine and agreed to never again sell their videos to or from Hamilton County." As Alan Dute's lawyer indicated in her affidavit, "[Alan] Dute was never charged with pandering obscenity in the past."
{¶ 63} A second lawyer from the same law firm filed an affidavit with the court alleging that he had heard a radio news report. According to him, "Although I do not recall the exact wording of the story, I do remember that it contained a reference to a prior obscenity matter involving the Dutes. As I recall, the story suggested that, according to the prosecutor's office, both Jennifer and Allan [sic] Dute should know better than to sell adult videos in Hamilton County because they had entered into an agreement not to sell such videos in the county as part of the resolution of their prior matter."
{¶ 64} The only evidence before the trial court regarding the media coverage consisted of the affidavits of the lawyers concerning their memories of the news reports and a copy of the newspaper article. Other than the newspaper article, no videotape or audiotape of television or radio reporting was submitted. A reading of the lawyers' affidavits makes clear that none of the news stories reported that the Dutes had been previously convicted of pandering obscenity, but only that they previously had been charged with the offense. According to the memory of the lawyers, at least one of the television reports indicated that the previous charges had been dismissed. Each report incorrectly indicated that Alan Dute had been charged in the past with pandering obscenity.
{¶ 65} The majority's conclusion that Jennifer Dute was prejudiced by the media reports is seriously undermined by the fact that Alan Dute was acquitted by the jury despite the media's false report that he previously had been charged with pandering obscenity. Although several jurors had been exposed to misinformation about Alan Dute's past, they were obviously not so inflamed by the news reports that they could not decide the case on the evidence, as they had been instructed by the trial court.
{¶ 66} The majority further holds that the trial court "failed to conduct a meaningful voir dire of the jurors" upon learning that some had been exposed to the news accounts. The record reveals that the trial court asked the jurors whether the information had caused them to "make up their mind, change their mind, anything?" The court, having already instructed the jurors that they should gain no additional information on the case outside the courtroom, further instructed them to refrain from exposure to news accounts about the case.
{¶ 67} In Mu'Min v. Virginia,[25] the trial judge had denied a defense motion for individual voir dire relating to the content of news items to which potential jurors might have been exposed. Upon learning of a potential juror's exposure to news accounts regarding the case, the judge had simply asked whether the juror had formed an opinion. Although eight of the twelve jurors eventually sworn admitted that they had been exposed to information about the case, none indicated that they would be biased in any way. The United States Supreme Court held that "the trial judge's refusal to question prospective jurors about the specific contents of the news reports to which they had been exposed did not violate [the defendant's] Sixth Amendment right to an impartial jury or his right to due process under the Fourteenth Amendment."[26]
{¶ 68} The Court further noted that its prior cases had "stressed the wide discretion granted to trial courts in conducting voir dire in the area of pretrial publicity and in other areas that might tend to show juror bias."[27]
{¶ 69} The Ohio Supreme Court also has consistently emphasized that a trial court has discretion in determining a juror's ability to be impartial.[28] In State v. Phillips,[29] five jurors had heard out-of-court comments by a grand juror who had said that the case was the worst one that she "was on,"[30] and that she hoped the defendant got what he deserved. The jurors had immediately reported the comments to the trial court. Following the trial court's examination of the jurors, the court stated that it was satisfied that the jurors would put the remarks out of their minds. The Ohio Supreme Court held that the trial court had not abused its discretion by retaining the jurors because they had stated that they would disregard the grand juror's comments.[31] "A juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court."[32] The court also noted that the comments had not been so inflammatory as to prejudice the members of the jury.[33]
{¶ 70} In State v. Wilson,[34] a capital murder case, the defendant claimed that the trial court had denied him due process by not allowing him to conduct a voir dire of prospective jurors individually about specific mitigating factors. The Ohio Supreme Court cited Mu'Min
for the conclusion that "a trial court has `great latitude in deciding what questions should be asked on voir dire.' [Citations omitted.] Deciding `issues raised in voir dire in criminal cases has long been held to be within the discretion of the trial judge.'"[35]
{¶ 71} In this case, I believe that the trial court's inquiry following the media exposure was sufficient to ascertain whether the jurors had been biased. Following its inquiry, the trial court instructed the jurors to refrain from further media exposure, having already told them that they would have to rely solely on the evidence presented to them in the courtroom to resolve the case. The jury acquitted Alan Dute, despite several of its members having been exposed to media reports that had incorrectly reported that he had previously been charged with pandering obscenity. Accordingly, under the totality of the circumstances, I cannot conclude that Jennifer Dute was prejudiced by the jurors' exposure to the media reports.
{¶ 72} Therefore, I do not believe that the trial court abused its discretion in refusing to declare a mistrial. I am convinced that no material prejudice to Jennifer Dute is demonstrated by the record in light of the trial court's actions and the jury's acquittal of Alan Dute.
{¶ 73} The state was required to prove that Jennifer Dute, knowing the character of the material or performance involved, sold or delivered obscene material, in violation of R.C. 2907.32(A)(2). The standards that the jury was required to apply were (1) whether the average person, applying contemporary community standards, would have found that the work, taken as a whole, appealed to the prurient interest; (2) whether the work depicted or described, in a patently offensive way, sexual conduct; and (3) whether the work, taken as a whole, lacked serious literary, artistic, political, or scientific value.[36]
{¶ 74} The jury in this case was confronted with a very difficult task. The jury was obliged to watch four of Dute's videotapes in their entirety before concluding that the videotapes were obscene. As part of the appeals panel that reviewed this case, I, too, was obliged to watch each of the Dute videotapes. To quote Justice Potter Stewart of the United States Supreme Court, "I know it when I see it."[37] The Dute videotapes are clearly obscene — they are garbage. I know it, and the jurors who decided this case knew it.
[5] The three videotapes were "Jeff Stryker's Underground," "Gangland 17," and "Kitty Foxx's Aged to Perfection."
[6] Hamilton County Common Pleas No. B-0009955.
[7] We note that one of Metcalf's lawyers represented Dute at trial and is her counsel in this appeal. Metcalf's second lawyer represented her husband, Alan, at trial.
[8] Koch v. Rist, 89 Ohio St.3d 250, 252, 2000-Ohio-149,730 N.E.2d 963, citing State v. Robb, 88 Ohio St.3d 59, 81,2000-Ohio-275, 723 N.E.2d 1019.
[9] State v. Keaton (1996), 113 Ohio App.3d 696, 702,681 N.E.2d 1375.
[10] Hamling v. United States (1974), 418 U.S. 87, 126-127,94 S.Ct. 2887.
[11] See State v. Hustler Magazine (Apr. 4, 1979), 1st Dist. No. C-77101. See, also, State v. Williams (1991), 75 Ohio App.3d 102, 115,598 N.E.2d 1250; State v. Keaton (1996), 113 Ohio App.3d 696,681 N.E.2d 1375.
[12] See State v. Mauer (1984), 15 Ohio St.3d 239, 250,473 N.E.2d 768.
[13] Hamling v. United States (1974), 418 U.S. 87, 125-126,94 S.Ct. 2887.
[14] State v. Abrams (July 8, 1981), 1st Dist. No. C-800410, citingHamling v. United States (1974), 418 U.S. 87, 125, 127,94 S.Ct. 2887.
[15] State v. McMillian (May 8, 1996), 1st Dist. No. C-950523, citingState v. Sage (1987), 31 Ohio St.3d 173, 182, 510 N.E.2d 343; State v.Smith (1990), 68 Ohio App.3d 692, 696, 589 N.E.2d 454.
[16] State v. Smith, supra, at 696, 589 N.E.2d 454, citing State v.Long (1978), 53 Ohio St.2d 91, 98, 372 N.E.2d 804.
[17] (1959), 360 U.S. 310, 79 S.Ct. 1171.
[18] (1973), 35 Ohio St.2d 18, 298 N.E.2d 597.
[19] (1975), 421 U.S. 794, 95 S.Ct. 2031.
[20] Id. at 799, 95 S.Ct. 2031.
[21] Id.
[22] Id. at 803, 95 S.Ct. 2031.
[23] 76 Ohio St.3d 107, 1996-Ohio-414, 666 N.E.2d 1099.
[24] Id. at 111-112, 1996-Ohio-414, 666 N.E.2d 1099, citing Murphy v.Florida, supra, at 798, 95 S.Ct. 2031.
[25] (1991), 500 U.S. 415, 111 S.Ct. 1899.
[26] Id.
[27] Id.
[28] See, e.g., State v. Sheppard, 84 Ohio St.3d 230, 235,1998-Ohio-323, 703 N.E.2d 286; State v. Williams (1983), 6 Ohio St.3d 281,288, 452 N.E.2d 1323. See, also, State v. Treesh, 90 Ohio St.3d 460,2001-Ohio-4, 739 N.E.2d 749 (decision on change of venue due to highly publicized nature of case is within sound discretion of trial court);State v. Landrum (1990), 53 Ohio St.3d 107, 559 N.E.2d 710 (trial court did not abuse its discretion in denying the defendant's motion for change of venue despite jurors' exposure to extensive pretrial media coverage, where no juror indicated it would affect his or her impartiality).
[29] 74 Ohio St.3d 72, 1995-Ohio-171, 656 N.E.2d 643.
[30] The court noted that the woman had not served on the grand jury that had indicted the defendant.
[31] 74 Ohio St.3d 72, 89, 1995-Ohio-171, 656 N.E.2d 643.
[32] Id., citing Smith v. Phillips (1982), 455 U.S. 209, 217,102 S.Ct. 940.
[33] Id.
[34] 74 Ohio St.3d 381, 1996-Ohio-103, 659 N.E.2d 292.
[35] Id. at 386, 1996-Ohio-103, 659 N.E.2d 292.
[36] Miller v. California (1973), 413 U.S. 15, 24, 93 S.Ct. 2607.
[37] Jacobellis v. Ohio (1964), 378 U.S. 184, 197; 84 S.Ct. 1676
(Stewart, J., concurring).