Jamaal Jackson appeals his convictions of one count of aggravated robbery with a firearm specification and one count of unauthorized use of property as well as the trial court's denial of Jackson's motion for a new trial on his complicity to commit Robbery and Felonious Assault charges.
 I.
This matter has its basis in two complaints filed against Jackson. The first complaint was filed against Jackson on September 18, 1996, in the Juvenile Court for one count of complicity to commit Robbery and one count of complicity to commit Felonious Assault. The complicity to commit Felonious Assault charge was converted into Felonious Assault on October 2, 1996. Because Jackson neither requested nor filed a transcript of his trial on this complaint, the only version of the facts underlying these charges that are available to us are those written and adopted by the trial court. We have reproduced those facts as follows:
 At about 7:00 p.m. on Saturday, September 9, 1996, the Defendant was on Fairview Ave. in Dayton, Montgomery County, Ohio, between Ravenwood and Catalpa with Guy Jackson, Brian Robbins and at least one other youth. At the same time, Raymond Martin, Diana Lee Grizzle and Rene Metcalf were walking along Fairview on their way to an art evening in an adjacent neighborhood. Upon seeing the Martin party, a member of the defendant's group said "here's a lick" referring to the Martin party as potential robbery victims. Guy Jackson approached the Martin party asking for change for a ten (10) or twenty (20) dollar bill. When told they had no money, he asked for a cigarette, was offered one, and he took and retained the entire pack. Another member of the defendant's asked the Martin party if the (sic) had any "weed" [marijuana] and were told they did not. Upon noticing Diana Grizzles' wallet, which was attached to her belt with a chain, one of defendant's group stated "she's got bank" meaning she had money. By this time defendant's group had closed in on the Martin party. Guy Jackson grabbed at the wallet and Raymond Martin grabbed his arm. From behind he heard "hey, that's my cousin" and he was struck in the back of the head. Martin immediately turned to face the defendant, Jamaal Jackson, who punched Martin in the face. Martin reacted and the two ended up on the ground with the defendant and others punching and kicking Martin. Diana Grizzle came to Martin's assistance and grabbed the defendant.
 During the incident, Raymond Martin suffered injuries to his head, face and nose that resulted in bleeding, pain, dizziness, bumps and bruises. He was transported to Good Samaritan Hospital by the Dayton Police who feared he suffered a concussion and he was treated in the Emergency Room. Diana Grizzle suffered a broken finger for which she received treatment. Her wallet was taken and in it (sic), as well as its contents including twenty dollars ($20), was lost to her. Guy Jackson ended up with the wallet and the money. He, in the company of defendant, went away from their group following the incident only to return a short time later with "weed" [marijuana] purchased with Diana Grizzles' money.
The second complaint was filed against Jackson on October 21, 1997, in the Juvenile Court for one count of Aggravated Robbery with a Firearm Specification and one count of Unauthorized use of a vehicle. That complaint was based upon an incident that occurred on October 19, 1996. Between two o'clock and six forty-five in the morning on that date, a car owned by Eric Barnes was stolen from in front of his house. Barnes reported the theft to the police, providing all of the necessary identifying information. The car was a light blue 1983 Oldsmobile 98 with a dark blue top and license plate number NCK627. The car was never recovered.
At approximately seven o'clock in the morning on that same date, Diane Carpenter King was leaving her home for naval reserve duty. As Miss King was backing out of her driveway, another car backed up from the stop sign at the end of her street and stopped in the street behind her car. King tried to back the car out of her driveway, but was blocked by the car in the street. There were four individuals in the car.
An individual who King later identified as Jackson got out of the front passenger seat of the car and ran up to her car, carrying a gun. The individual passed through the beam of her headlights, and started pulling on her door, knocking on the window, and demanding that she open the door. King unlocked her door and opened it. According to King, the individual stated, "Give me your money, bitch, get out the car, bitch." King said that she replied, "Okay. Don't shoot me," and that she reached under her seat for her purse and handed it to the individual. Meanwhile, another individual exited the car, opened King's passenger door, removed King's duffle bags, and returned to the car.
After King handed the first individual her purse, he took it and walked in front of the car's headlights to look through her purse so as to find King's wallet. When the individual was unable to locate her wallet, he looked at King and asked her where her money was. King replied that it was in her purse, and the individual responded that it had better be there. Thereafter, he walked back to the car and got into it. The car was then driven away.
King was able to get a description of the car as it pulled away as well as the car's license plate number. King went into her house and called the police. King described the car to the police as a four door older model car which resembled a Buick with the license plate number NCK627. The license plate number matched the car that was stolen earlier that morning from Eric Barnes. King also provided the police with a physical description of both of the perpetrators. Additionally, King provided the police with a detailed description of the gun, an A-K 47, that the first perpetrator carried.
Two days later King was interviewed by Detective Timothy Bilinski. During the interview, Detective Bilinski showed King a photo line-up. King immediately identified Jackson as the first perpetrator. A week before the trial, another police officer, Detective Adragna, showed King an additional photo line-up in order to identify the second perpetrator. King identified an individual in the photo line-up as the second perpetrator and then misidentified another individual in the photo line-up as Jackson. Detective Adragna corrected King by informing her that the individual that she had identified was not Jackson. King then looked at the photograph more thoroughly and determined that the individual resembled Jackson, that is, except for the fact that the individual wore a different hair style and had facial hair.
On October 30, 1996, Jackson was adjudicated delinquent by a magistrate on both counts in the first complaint. On November 29, 1996, the magistrate issued a recommendation of sentence on the counts in the first complaint, and, in that decision, the trial court adopted the magistrate's adjudication of delinquency on the first complaint as well as the magistrate's recommended sentence. On the same date, the magistrate also adjudicated Jackson delinquent on both counts in the second complaint and recommended a sentence. The trial court likewise adopted the magistrate's decision and recommended sentence in the second complaint on that date.
The court sentenced Jackson to a minimum of twelve months in the Department of Youth Services for the counts in the first complaint. As to the counts in the second complaint, the court sentenced Jackson to a minimum of twelve months in the Department of Youth Services to be served concurrently with the sentences that the court imposed on the charges in the first complaint.
On November 12, 1996, Jackson's counsel moved the court for separate findings of fact and conclusions of law with regard to the magistrate's decision on October 30, 1996, in which the magistrate adjudicated Jackson delinquent on the charges in the first complaint. Likewise, on December 5, 1996, his counsel moved the court for separate findings of fact and conclusions of law with regard to the magistrate's decision on November 29, 1996, in which the magistrate adjudicated Jackson delinquent on the charges in the second complaint. On December 9, 1996, Jackson's counsel objected to the magistrate's November 29, 1996, adjudication of Jackson's delinquency on the charges in the second complaint.
Jackson's counsel also moved the court for an extension to file more complete objections to the magistrate's decision. The court granted him an extension until January 24, 1997. On January 24, 1997, Jackson's counsel filed his objections to the magistrate's adjudication of delinquency on the second complaint, recorded on November 29, 1996, and moved the trial court for a new trial on the charges in the second complaint. Conversely, Jackson never filed objections to the magistrate's October 30, 1996, decision on the first complaint.
Jackson's counsel's requests for findings of fact and conclusions of law were not initially properly filed with the court, however. Nonetheless, as soon as the magistrate became aware that Jackson's counsel had made those requests, the magistrate prepared and issued its findings of fact and conclusions of law in both cases. The magistrate issued its findings of fact and conclusions of law in the first case on February 11, 1997, and in the second case on March 7, 1997. Because the magistrate's finding of facts and conclusions of law were recorded after Jackson was required to file his objections, the trial court gave Jackson's counsel the opportunity to supplement his objections.
Rather than preparing new objections, on February 25, 1997, Jackson's counsel moved the court for a new trial on the first complaint, although misfiling it under the second complaint. Jackson's counsel neglected to file any objections to the magistrate's findings of fact and conclusions of law in the first complaint. Likewise, he failed to file supplemental objections to the magistrate's findings of fact and conclusions of law in the second complaint.
On March 12, 1997, the trial court overruled Jackson's counsel's objections to the magistrate's decision on the second complaint and denied his counsel's motion for a new trial on the charges in the second complaint because the motion was not filed under the appropriate case and, thus, the court was without jurisdiction to consider the motion. The court then went on to adopt the magistrate's decision and findings of fact and conclusions of law as to the second complaint as its own.
On April 2, 1997, the trial court denied Jackson's counsel's motion for a new trial on the first complaint, finding his counsel's arguments to be unpersuasive. The court then went on to adopt the magistrate's decision and findings of fact and conclusions of law regarding the first complaint as its own, stating that Jackson's counsel had failed to file any objections to the magistrate's decision or findings of fact and conclusions of law in the first complaint. Jackson now brings this timely appeal of the trial court's decisions.
 II.
In his first assignment of error, Jackson argues that:
 THE MAGISTRATE'S DECISION IS CLEARLY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Jackson claims that his conviction for Aggravated Robbery for the crime committed against King was against the manifest weight of the evidence. Jackson supports his argument by asserting that the State's case rested upon one witness' identification of Jackson and that the witness' identification was shown to be unreliable. Jackson asserts that the witness' identification of Jackson was unreliable because when the witness was presented with a photo line-up to identify the second perpetrator, the witness misidentified one of the individuals as Jackson.
In addition to arguing that the State's witness' testimony was discredited, Jackson maintains that the State was unable to produce any other evidence of Jackson's guilt. Jackson points out that the State was unable to locate in Jackson's home the Michigan starter jacket that the perpetrator was allegedly wearing, any of the items that were allegedly stolen, or the A-K 47 that the perpetrator was allegedly carrying. Jackson also argues that he had an alibi defense in that both of his parents testified that they were awake before and after the incident and that Jackson was in his room asleep. Jackson argues that because the State's witness' testimony was unreliable, the State had no other evidence of his guilt, and he had an alibi defense, his conviction was against the manifest weight of the evidence.
The Supreme Court recently clarified the manifest weight of the evidence standard in State v. Thompkins (1997), 78 Ohio St.3d 380. The Court declared that the sufficiency of the evidence and manifest weight of the evidence are different legal standards. The Court explained that the sufficiency of the evidence standard is applied to determine whether a case should have been allowed to go to a jury or, in other words, whether the evidence was legally insufficient to support the jury's verdict as a matter of law.Id. at 386.
On the contrary, the Court stated that the manifest weight of the evidence standard concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." Id. at 387, quoting Black's Law Dictionary (6 Ed. 1990) 1433. The Court further elucidated that "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the fact finder's resolution of the conflicting testimony." Id. citing Tibbs v. Florida
(1982), 457 U.S. 31, 42. Finally, to define the standard more precisely, the Court approved of the following manifest weight of the evidence standard set forth in State v. Martin (1983),20 Ohio App.3d 172:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.
With this standard in mind, we will address Jackson's argument. After reviewing the entire record, weighing the evidence and inferences, and considering the credibility of the witnesses, we determine that the greater amount of credible evidence supports Jackson's conviction. As to Jackson's argument that King's photo identification of him was unreliable, the United States Supreme Court has identified several factors that are to be considered in evaluating the likelihood of misidentification. Those factors include the witness' opportunity to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description; the witness' certainty when identifying the suspect at the time of the confrontation; and the length of time that had elapsed between the crime and the identification. State v. Davis (1996), 76 Ohio St.3d 107,666 N.E.2d 1099; State v. Allen (1995), 73 Ohio St.3d 626,653 N.E.2d 675, certiorari denied (1996), 116 S.Ct. 1276,134 L.Ed.2d 222, rehearing denied, 74 Ohio St.3d 1422; State v. Spirko
(1991), 59 Ohio St.3d 1, 570 N.E.2d 229, certiorari denied,502 U.S. 913, 112 S.Ct. 312, 116 L.Ed.2d 254.
Applying these factors to the present case, we find King's identification to be reliable. Although the incident occurred early in the morning, King saw the perpetrator's face as he approached her and crossed in front of her car's headlights. Furthermore, during their encounter, the perpetrator was only standing approximately two feet away from King and she was able to see the perpetrator's face in the early morning light. Additionally, once King handed her purse over to the perpetrator, he stood in front of her car's headlights and looked through her purse. When he was unable to locate her wallet, the perpetrator looked at King and asked her where her money was. The encounter lasted several minutes, and King stated that she remained calm during the entire encounter.
Additionally, King was shown the first photo line-up only two days after the incident. During her review of the photo line-up, King immediately, and without any hesitation, identified Jackson as the perpetrator. When King was asked whether she was sure that Jackson was the perpetrator, King stated that she was certain that he was the perpetrator. Although several weeks later King misidentified an individual as Jackson during her review of a second photo line-up, King explained the misidentification by stating that, in her view, the individual resembled Jackson. King testified that after she reviewed the photograph more thoroughly, she realized that the individual was not Jackson, but that he resembled Jackson, that is, besides differences in facial hair and hair style.
King further testified that although she misidentified an individual as Jackson several weeks after the incident, she was certain that Jackson was the perpetrator. King stated that her initial identification of Jackson, which was only two days after the incident, was correct. King also identified Jackson as the perpetrator in court, and testified that she was positive that he was the perpetrator.
We conclude that the circumstances surrounding the incident were such that King had ample time and lighting to view the perpetrator. Furthermore, King identified Jackson from a photo line-up only two days after the incident. Additionally, when King saw Jackson's picture, she immediately, without hesitation, identified him as the perpetrator. Finally, King's misidentification was attributable to the length of time that had passed since the incident and the fact that the individual resembled Jackson.
Jackson additionally supports his argument that his conviction was against the manifest weight of the evidence by pointing out that the police did not find in their search of Jackson's residence the Michigan starter jacket that King described the perpetrator as wearing, the gun that the perpetrator allegedly used, or any of the items allegedly stolen from King. Although indeed the police did not find these items, there was evidence presented at trial that Jackson owned a Michigan starter jacket. The police had a line-up photograph of Jackson in which he was wearing what appeared to be a Michigan starter jacket. This photograph was introduced into evidence at trial.
Finally, Jackson supports his claim that his conviction was against the manifest weight of the evidence by arguing that he had an alibi defense. We are unable to find that Jackson had a viable alibi defense. A review of Jackson's father's testimony discloses that his father only testified that he saw Jackson in bed some time between seven thirty and eight o'clock on the morning of the crime. This does not serve as an alibi for Jackson because the crime purportedly took place before or around seven o'clock in the morning.
Similarly, we are unable to find that his mother's testimony provides Jackson with an alibi defense. A review of Jackson's mother's testimony reveals that she did not actually see her son until around seven fifty in the morning, fifty minutes after the crime was committed. Furthermore, although Jackson's mother testified that she was awake in the living room of their house from around five forty-five in the morning, and that she did not see Jackson leave through either of the doors on the first floor of their house, she also testified that there were other exits or doors on the second floor of their house. Furthermore, she did not testify as to whether Jackson could have left through one of those doors or exits. Based upon the foregoing reasons, we find that this assignment of error lacks merit.
 III.
Because Jackson's second and third assignments of error are closely related, we will consider them together. Those assignments of error are as follows:
SECOND ASSIGNMENT OF ERROR
 THE APPELLANT WAS DENIED DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.
THIRD ASSIGNMENT OF ERROR
 THE APPELLANT WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
Both of Jackson's assignments of error concern the State's failure to inform Jackson's defense attorney of King's later misidentification of Jackson. Jackson's counsel did not receive the information concerning King's misidentification of Jackson until immediately before trial. His counsel argues that because he received this information late, the defense was unable to call Detective Adragna, who performed the second photo line-up, to give direct testimony regarding the faulty identification. Furthermore, Jackson's counsel argues that because the defense was unable to present Detective Adragna's direct testimony that King misidentified Jackson, and that he corrected King, Jackson was denied his right to exculpatory evidence under the due process clause along with his right to effective assistance of counsel.
After reviewing the trial transcripts, we find Jackson's assignments of error to be without merit. The State was not aware of the second photo line-up until the morning of the trial and promptly shared that information with the defense. Furthermore, King admitted to her misidentification during her direct testimony at trial, and was cross-examined by the defense as to her misidentification. Moreover, another Detective who testified at trial corroborated that King had misidentified Jackson. In view of this testimony, Detective Adragna's direct testimony that King misidentified an individual as Jackson would have simply been cumulative. Therefore, we are unable to find under either the standard for the production of exculpatory evidence or ineffective assistance of counsel that Jackson's Constitutional rights were violated.
 IV.
In his fourth assignment of error, Jackson asserts that:
 THE MAGISTRATE ERRED IN DENYING A NEW TRIAL FOR THE APPELLANT BY REASON OF A FAILURE TO FILE AN AMENDED FINDING OF FACTS AND CONCLUSIONS OF LAW AS REQUIRED BY RULE 40 OF THE OHIO RULES OF JUVENILE PROCEDURE.
Jackson claims that the magistrate failed to comply with Ohio Juvenile Rule of Procedure 40, which provides that:
 If any party makes a request for findings of fact and conclusions of law under CIV.R. 52 or findings and conclusions are otherwise required by law or by the order of reference, the magistrate's decision shall
include findings of fact and conclusions of law. If the request under CIV.R. 52 is made after the magistrate's decision is filed, the magistrate shall include the findings of fact and conclusions of law in an amended magistrate's decision.
Juv.R. 40 (Emphasis supplied). Jackson argues that his counsel requested that the magistrate make findings of fact and conclusions of law as to the magistrate's decisions on the two complaints filed against him. Jackson maintains that he requested findings of fact and conclusions of law in order to prepare detailed objections to the magistrate's decision. Jackson claims, however, that he was required to file his objections to the magistrate's decisions before the magistrate rendered its findings of fact and conclusions of law. Jackson argues that, as a consequence, Juv.R. 40 was not complied with because the magistrate did not render its findings of fact and conclusions of law in a timely manner.
The facts underlying Jackson's argument begin with the magistrate's adjudication of Jackson's delinquency on October 30, 1996, as to both counts in the first complaint filed against Jackson. On November 29, 1996, the magistrate issued a recommendation of sentence on the counts in the first complaint, and, in that decision, the trial court adopted the magistrate's adjudication of delinquency on the first complaint as well as the magistrate's recommended sentence. On the same date, the magistrate also adjudicated Jackson delinquent on both counts in the second complaint and recommended a sentence. The trial court likewise adopted the magistrate's decision and recommended sentence in that case on November 29, 1996.
On November 12, 1996, Jackson's counsel moved the court for separate findings of fact and conclusions of law with regard to the magistrate's decision on October 30, 1996, in which the magistrate adjudicated Jackson delinquent on the charges in the first complaint. Likewise, on December 5, 1996, his counsel moved the court for separate findings of fact and conclusions of law with regard to the magistrate's decision on November 29, 1996, in which the magistrate adjudicated Jackson delinquent on the charges in the second complaint. On December 9, 1996, Jackson's counsel objected to the magistrate's November 29, 1996, adjudication of Jackson's delinquency on the charges in the second complaint.
Jackson's counsel also moved the court for an extension to file more complete objections to the magistrate's decision. The court granted him an extension until January 24, 1997. On January 24, 1997, Jackson's counsel filed his objections to the magistrate's decision in the second complaint, filed on November 29, 1996, and moved the trial court for a new trial on the charges in the second complaint. Conversely, Jackson never filed objections to the magistrate's decision in the first complaint, filed on October 30, 1996.
Although Jackson's counsel requested findings of fact and conclusions of law in both cases, his counsel's requests were not properly filed with the court. Nonetheless, as soon as the magistrate became aware that his counsel had made those requests, the magistrate prepared and issued its findings of fact and conclusions of law in both cases. The magistrate issued its findings of fact and conclusions of law in the first case on February 11, 1997, and in the second case on March 7, 1997. Because the magistrate's finding of facts and conclusions of law were recorded after Jackson's counsel was required to file his objections, the trial court gave Jackson's counsel the opportunity to supplement his objections.
Rather than preparing new objections, on February 25, 1997, Jackson's counsel moved the court for a new trial on the first complaint, but his counsel misfiled the motion under the second complaint. Jackson's counsel neglected to ever file any objections to the magistrate's findings of fact and conclusions of law in the first complaint. Likewise, his counsel failed to file supplemental objections to the magistrate's findings of fact and conclusions of law in the second complaint.
On March 12, 1997, the trial court overruled Jackson's counsel's objections to the magistrate's decision on the second complaint. Additionally, the court denied his counsel's motion for a new trial on the charges in the second complaint because the motion was not filed under the appropriate case and, thus, the court was without jurisdiction to consider the motion. The court then went on to adopt the magistrate's decision and findings of fact and conclusions of law concerning the second complaint as its own.
On April 2, 1997, the trial court denied Jackson's counsel's motion for a new trial on the first complaint, finding his counsel's arguments to be unpersuasive. The court then went on to adopt the magistrate's decision and findings of fact and conclusions of law regarding the first complaint as its own. The court explained that Jackson's counsel had failed to file any objections to the magistrate's decision or findings of fact and conclusions of law in the first complaint.
After reviewing the record in this matter, we are convinced that this assignment of error lacks merit. This exact argument was addressed to the trial court. In resolving Jackson's counsel's argument, the court explained that his counsel's request for findings of fact and conclusions of law were not properly served upon the magistrate or the court. The court further stated that once the magistrate became aware that such a request had been made, the magistrate issued its findings of fact and conclusions of law. Moreover, the court explained that the magistrate's findings of fact and conclusions of law were presented to Jackson's counsel, and that his counsel was given the opportunity to prepare objections to the magistrate's decision on the first complaint and to supplement his objections to the magistrate's decision on the second complaint. The court concluded that it could not find a violation of Juv.R. 40 because Jackson had been given the opportunity to file objections, but neglected to do so.
We are likewise unable to find a violation of Juv.R. 40. Although the magistrate did not render its findings of fact and conclusions of law before Jackson's counsel was initially required to file his objections, the trial court attempted to correct this error by giving Jackson's counsel the opportunity to file objections after the magistrate's findings of fact and conclusions of law were recorded. Thus, Jackson's counsel was given the opportunity to file objections, but merely neglected to do so. Based upon that reasoning, we find no violation of Juv.R. 40, and we determine that this assignment of error lacks merit. The assignment of error is overruled.
 V.
In his final assignment of error, Jackson argues that:
 THE MAGISTRATE ERRED IN DENYING A NEW TRIAL FOR THE APPELLANT PURSUANT TO JUVENILE RULE 35 (a) FOR THE REASON THAT ONE OF THE KEY PROSECUTION WITNESSES WITHHELD IMPORTANT FACTS FROM THE COURT, THUS DENYING THE COURT THE OPPORTUNITY TO RESOLVE THIS MATTER ON THE FACTS AS THEY ACTUALLY OCCURRED.
In this assignment of error, Jackson argues that the trial court erred in not granting him a new trial on the charges in the first complaint, case number JC 96-5915. Jackson argues that he is entitled to a new trial in that case because the State's "star" witness, Ronald Jackson, has recanted his testimony. As support for his claim, Jackson has attached the affidavit of Ronald Jackson in which he attests that Jackson was not involved in the crime.
We find that we are unable to address the merits of this assignment of error because Jackson's counsel failed to appeal the trial court's judgment in case number JC 96-5915. Although Jackson's counsel placed both case numbers on his notice of appeal, he only specifically stated that he was appealing the trial court's March 12, 1997, judgment in case number JC 96-6765. Jackson's counsel did not indicate that he was also appealing the trial court's April 2, 1997, judgment in case number JC 96-5915. Appellate Rule 3 (D) provides that the notice of appeal shall designate the judgment, order, or part thereof appealed. Jackson's counsel's inclusion of the case number is inadequate to satisfy Appellate Rule 3 (D) because the case number does not provide notice of which judgment is being appealed under case JC 96-5915. Because Jackson's counsel has failed to comply with Appellate Rule 3 (D), he has not properly appealed the trial court's denial of his motion for a new trial in case number JC 96-5915. Hence, we are without jurisdiction to address this assignment of error. This assignment of error is overruled.
The judgment of the trial court is Affirmed.
FAIN, J. and GRADY, J., concur.
Copies mailed to:
Cheryl A. Ross
L. Patrick Mulligan
Hon. Michael B. Murphy