[Cite as *State v. Royal*, 2014-Ohio-1175.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | CASE NO. 12 MA 148 |
| V. | ) | |
| | ) | OPINION |
| RAYSHAWN ROYAL, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from Court of Common
Pleas of Mahoning County, Ohio
Case No. 11CR1136

JUDGMENT:     Affirmed

APPEARANCES:
For Plaintiff-Appellee     Paul Gains
Prosecutor
Ralph M. Rivera
Assistant Prosecutor
21 W. Boardman St., 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant     Attorney Douglas A. King
91 West Taggart St., P.O. Box 85
East Palestine, Ohio 44413

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated: March 17, 2014

DONOFRIO, J.

{¶1} Defendant-appellant, Rayshawn Royal, appeals from a Mahoning County Common Pleas Court judgment convicting him of aggravated murder, aggravated robbery, and a firearm specification following a jury trial.

{¶2} Late on the night of June 18, 2011, three juvenile girls, Keyoshia, Miranda, and Nautica, were at Nautica's house on South Avenue in Youngstown. Keyoshia called her friend, Brandon Adkins, to walk her and her young son home. Brandon arrived and talked to the girls for a few moments. Brandon and the girls were outside. Soon two black males walked up Nautica's driveway. They demanded that Brandon empty his pockets, telling him he had five seconds. The two pointed guns at Brandon. Then they both shot him. The two males ran from the driveway. Brandon died as a result of the gunshot wounds.

{¶3} Police interviewed Keyoshia, Miranda, and Nautica. They all claimed to have seen the shooters. But none of them initially identified the shooters. Each of the girls repeatedly denied to the police that they knew who the shooters were. Eventually, however, Miranda and Nautica named appellant and Deandre McCrary, aka "Little D" or "Boosie," as the shooters.

{¶4} The police then presented each of the girls with two photographic lineups. The police had obtained appellant's and McCrary's names from the crowd that formed at the murder scene. Keyoshia identified both appellant and McCrary in the photo lineups. Miranda identified McCrary. Nautica could not identify anyone in the lineups.

{¶5} A Mahoning County Grand Jury indicted appellant on one count of aggravated murder in violation of R.C. 2903.01(B)(F), and one count of aggravated robbery in violation of R.C. 2911.01(A)(1)(C), both with firearm specifications. Appellant pleaded not guilty. McCrary was also indicted on these charges and the two co-defendants proceeded to a joint trial.

{¶6} Appellant and McCrary filed a motion to suppress evidence obtained as a result of the photo lineups. The trial court held a hearing on the motion where it heard testimony regarding the photo lineups. Both appellant's counsel and

McCrary's counsel participated in the hearing. At the end of the hearing, the court stated it would issue its decision as soon as possible. Apparently due to an oversight, the court's judgment overruling the motion was only filed in the record of McCrary's case and not in the record of appellant's case.

{¶7} The matter went to a joint jury trial. The jury found appellant and McCrary guilty as charged. Subsequently, the trial court sentenced appellant to 25 years to life on the aggravated murder count and 10 years on the aggravated robbery count. The trial court merged the two firearm specifications and sentenced appellant to three years on the specification. The court ordered appellant to serve the prison terms on counts one and two concurrent to each other and consecutive to the firearm prison term for a total sentence of 28 years to life.

{¶8} Appellant filed a timely notice of appeal on August 13, 2012.

{¶9} Appellant now raises six assignments of error, the first of which states:

DEFENDANT/APPELLANT WAS DENIED DUE PROCESS OF LAW AND EQUAL PROTECTION UNDER THE LAW WHEN THE TRIAL COURT FAILED TO RENDER A DECISION WITH REGARD TO THE DEFENDANT/APPELLANT'S MOTION TO SUPPRESS EYEWITNESS IDENTIFICATION, SAID MOTION TO SUPPRESS BEING BASED UPON THE DEFENDANT/APPELLANT'S RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION.

{¶10} Appellant contends the trial court erred by failing to enter a judgment entry on his motion to suppress. He asserts the court failed to comply with Crim.R. 12(F), by failing to rule on his motion or state its factual findings prior to trial.

{¶11} Pursuant to Crim.R. 12(F), a motion to suppress shall be determined before trial. "Where factual issues are involved in determining a motion, the court

shall state its essential findings on the record." Crim.R. 12(F).

{¶12} Appellant and McCrary filed a joint motion to suppress on May 29, 2012. The motion contained both defendants' names and case numbers and was signed by both defendants' counsel.

{¶13} The trial court held a hearing on the motion on June 5, 2012. Both appellant's counsel and McCrary's counsel participated in the hearing. At the conclusion of the hearing, the court stated it would issue its decision as soon as possible. For some unknown reason, most likely an oversight by the clerk, the judgment entry denying the motion to suppress was not filed in the record of appellant's case. It was, however, filed in the record of McCrary's case the same day as the hearing. It is signed by the court and file-stamped. The judgment entry, a copy of which the state attached to its brief and which can also be viewed on the court's public docket, includes both appellant's and McCrary's names and case numbers. Additionally, the court concluded the entry by stating the "Defendants' Motion to Suppress" was overruled. The judgment includes factual findings as to each of the arguments set out in the joint motion to suppress. This judgment entry complies with Crim.R. 12(F).

{¶14} Moreover, appellant's trial counsel must have been aware of the court's judgment overruling the motion to suppress. Appellant's counsel listened to direct testimony from all three eyewitnesses concerning the photo lineups and cross examined them on this subject. Had counsel thought that the trial court had failed to rule on the motion to suppress, presumably he would have raised this issue with the court when the subject of the photo lineups was brought up during trial.

{¶15} The fact the court's judgment entry overruling the motion to suppress was not filed in appellant's case was likely due to a mistake or oversight by the clerk. We can presume appellant's counsel was aware of the ruling. And since the judgment entry is on the public court docket in McCrary's case and was clearly intended to be part of the record in this case, we can review its merits, which is the subject of the next assignment of error. For these reasons, appellant was not denied

due process of law or equal protection under the law as he asserts.

**{¶16}** Accordingly, appellant's first assignment of error is without merit.

**{¶17}** Appellant's second assignment of error states:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING THE EYEWITNESS IDENTIFICATION TESTIMONY AS THE SAME VIOLATED DEFENDANT/APPELLANT'S RIGHT TO DUE PROCESS OF LAW GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION.

**{¶18}** Here appellant argues the trial court should not have admitted identification testimony by Keyoshia, Nautica, and Miranda.

**{¶19}** As to Keyoshia, appellant points out that she was not sure of the shooters' identities at the time of the shooting, provided no names to police, and did not initially make an identification, despite the fact that she supposedly knew appellant and McCrary well. Appellant states that Keyoshia was only able to pick his and McCrary's photos from the lineup after the police mentioned their names to her. And he states that Keyoshia admitted she only told the police what they wanted to hear.

**{¶20}** As to Nautica, appellant notes that she never identified anyone in the photo lineups. He also points out that Nautica has poor eyesight and was not wearing corrective lenses at the time of the shooting. Appellant further points out that Nautica did not know him at the time of the shooting and only heard him speak once. Yet she claimed to have recognized his voice on the night of the shooting.

**{¶21}** As to Miranda, appellant notes that she did not give the police the names of the shooters but only agreed with the names the police suggested to her. Additionally, he points out that Miranda initially testified she could see the shooters' faces because they were not wearing hoodies but then changed her story to say that

the shooters were wearing dark-colored hoodies, and then to say that she was not sure whether they were wearing hoodies.

**{¶22}** Appellant also makes an argument that the photo lineup was not administered by a blind administrator as required by R.C. 2933.83(A)(3).

**{¶23}** Our standard of review with respect to a motion to suppress is first limited to determining whether the trial court's findings are supported by competent, credible evidence. *State v. Winand*, 116 Ohio App.3d 286, 288, 688 N.E.2d 9 (7th Dist.1996), citing *Tallmadge v. McCoy*, 96 Ohio App.3d 604, 608, 645 N.E.2d 802 (9th Dist.1994). Such a standard of review is appropriate as, "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E .2d 831 (4th Dist.1994). An appellate court accepts the trial court's factual findings and relies upon the trial court's ability to assess the witness's credibility, but independently determines, without deference to the trial court, whether the trial court applied the appropriate legal standard. *State v. Rice*, 129 Ohio App.3d 91, 94, 717 N.E.2d 351 (7th Dist.1998). A trial court's decision on a motion to suppress will not be disturbed when it is supported by substantial credible evidence. *Id*.

**{¶24}** Many of appellant's arguments as to why the trial court should have granted his motion to suppress rely on testimony that came out during the trial. There was no mention at the suppression hearing or in the interviews with the witnesses of such things as Keyoshia only telling police what they wanted to hear, as to Nautica's poor eyesight, or as to Miranda's changing testimony regarding the hoodies. These arguments were not part of the motion to suppress as they rely on testimony that was only elicited at trial.

**{¶25}** The motion to suppress raised two basic arguments: (1) the photo lineups were unduly suggestive because the witnesses were told they were to look for the defendants in the photo arrays, the witnesses appeared to have previously known the defendants, and many of the non-suspect photos appeared to have been

known to those viewing the arrays; and (2) the administrator was not "blind." Our review on the motion to suppress is limited to the arguments raised in the trial court at the motion to suppress hearing.

**{¶26}** The first issue was whether the photo lineups were unduly suggestive.

**{¶27}** When determining whether an out-of-court identification is admissible, a trial court uses a two-step approach. *Neil v. Biggers*, 409 U.S. 188, 196-200, 93 S.Ct. 375 (1972). The court first determines whether the identification procedure was impermissibly suggestive. *Id.* at 196-197. Then, if the procedure was impermissibly suggestive, the court must determine if the identification was reliable despite being suggestive. *Id.* at 199.

**{¶28}** The trial court found the following after listening to the testimony, watching the videotapes of the witness interviews, and looking at the photo lineups. As to Miranda's interview, the court noted Miranda stated she could probably identify the shooters if she saw their pictures. When she looked at the photos, Miranda identified one of the shooters as photo number five in the first lineup and said she was not sure about photo number three in the second lineup. The trial court did not specify which of the two shooters Miranda identified. As to Nautica's interview, the court noted that Nautica stated she could see clearly because of the street light. She gave police the name of "Ray Royal" and said he disguised his voice. Nautica stated that she knew him. She also provided the other defendant's nickname of "Boosier" [sic.]. Nautica was not able to identify either defendant in the photo lineups. As to Keyoshia, the court noted Keyoshia was cooperative until the detectives asked her about the identity of the defendants. She then began to raise her voice and argue with the detectives. When looking at the photo lineups, Keyoshia was cooperative. She immediately identified both defendants in the two lineups. Based on these findings, the court concluded there was no evidence that the fact that the police may have mentioned the names of the defendants to one or more of the witnesses made the photo lineups unduly suggestive.

**{¶29}** Detective Sergeant Rick Spotleson was the first witness at the

suppression hearing. Det. Spotleson stated that he listened to what the crowd was saying at the murder scene. (Suppression Tr. 14, 19). He testified he heard the names of Ray Royal and "Little D" McCrary as possible suspects. (Suppression Tr. 6-7). He contacted the juvenile division and received photographs of appellant and McCrary. (Suppression Tr. 7-8). Det. Spotleson gave the photographs to Detective Sergeant David Sweeney, who put together the photo lineup. (Suppression Tr. 8). Det. Spotleson stated that during Miranda's interview, she did not give the detectives any names until Det. Spotleson mentioned them. (Suppression Tr. 16).

**{¶30}** Det. Sweeney testified next. Det. Sweeney testified that during the interview with Nautica, she provided the detectives with the names Ray Royal and "Boosie" and gave a description of them. (Suppression Tr. 46-47). However, he acknowledged that when Captain Rod Foley showed Nautica the lineups she did not pick anyone out. (Suppression Tr. 47, 49).

**{¶31}** A review of the videotaped interviews revealed the following.

**{¶32}** During Miranda's interview, she gave a detailed description of "the two boys" whom she stated she could see because of the streetlight. She described one as a black male between 15 and 16 years old, around five-foot-one to five-foot-two, wearing a black hoodie, shorts, and Nikes. She described the other as a black male between 17 and 18 years old, chubby, wearing a grey hoodie and shorts, and holding a .9mm gun that was chrome on the top and black on the bottom. Miranda stated that the "fat one" tried to disguise his voice. And she stated that the "skinny one" ran back and picked up his shell casing after the shooting. She stated that she did not know either of their names. One of the detectives asked her "Who's Little D?" and "Who's Rayshawn?" But Miranda said she did not know. She stated that Brandon had mentioned Little D when talking about an incident at a party earlier that evening. Miranda then stated that Little D was the skinny guy who picked up the shell casing. At the photo lineup, Miranda identified McCrary. She was not sure about appellant.

**{¶33}** During Nautica's interview, she described the first shooter as a black male, 16 or 17 years old, about five-foot-four, chubby, wearing a grey hoodie, shorts,

and slide-in Nikes. She described the second shooter as a black male between 15 to 17 years old, about five-foot-four, wearing shorts, a black hoodie, and Nikes. She stated she could see pretty well from the street light. When asked what the chubby guy's nickname was, Nautica provided the name "Ray Royal." When asked what the other guy's nickname was, Nautica called him "Boosie." She stated that she had seen them around before. The detectives did not provide any names to Nautica. At the photo lineup, Nautica was not able to identify anyone.

{¶34} During Keyoshia's interview, she described one of "the boys" as fat and short, around five-foot-seven and 195 pounds, wearing a hoodie, and carrying a black gun. She described the other boy as skinny and dark, around five-foot-nine and 120 pounds, wearing a hoodie, and carrying a silver gun. The detectives did not mention any names to Keyoshia during the interview. The only name she provided to the detectives was that she had heard one of the boys' names was "D something" or started with a "D." At the photo lineup, Keyoshia identified both appellant and McCrary as the shooters.

{¶35} The photo lineups were not unduly suggestive. Firstly, in presenting the photo lineups, Cpt. Foley never told any of the girls that they were to look for appellant and McCrary. In fact, he told them that the perpetrators may or may not be in the lineups and that he did not know whose photographs were in the lineups. Secondly, the fact that the girls knew who appellant and McCrary were would not make the lineups suggestive. And in fact, it could serve to make their identifications more reliable. See, *State v. Davis*, 76 Ohio St.3d 107, 666 N.E.2d 1099 (1996); *State v. Doren*, 6th Dist. No. WD-06-064, 2009-Ohio-1667, ¶160 (witness identification of *strangers* has been deemed extremely unreliable). Thirdly, the detectives did not mention any names to Keyoshia. Thus, there is no argument that she was influenced by the detectives. And while the detective did mention the names Rayshawn and Little D to Miranda, Miranda did not even identify appellant in the photo lineup. Thus, the mentioning of appellant's name could not have made his photo lineup unduly suggestive.

{¶36} In sum, the trial court properly found the photo lineups were not unduly suggestive.

{¶37} The second issue in the motion to suppress was whether the photo lineups were administered by a "blind" or "blinded" administrator.

{¶38} R.C. 2933.83 sets out the requirements for conducting photo lineups. Pursuant to the statute, law enforcement agencies must adopt certain minimum requirements for conducting lineups. R.C. 2933.83(B). One such requirement is that, unless impracticable, a blind or blinded administrator shall conduct the lineup. R.C. 2933.83(B)(1). A "blind administrator" is one who does not know the identity of the suspect. R.C. 2933.83(A)(2). A "blinded administrator" is one who may know who the suspect is, but does not know which lineup member is being viewed by the eyewitness. R.C. 2933.83(A)(3). When it is impracticable for a blind administrator to conduct the lineup, the administrator shall state the reason for that impracticability in writing. R.C. 2933.83(B)(2). When it is impracticable for either a blind or blinded administrator to conduct the lineup, the administrator shall state the reason for that impracticability in writing. R.C. 2933.83(B)(3).

{¶39} Another such requirement is that, "[i]f a blind administrator is conducting the live lineup or the photo lineup, the administrator shall inform the eyewitness that the suspect may or may not be in the lineup and that the administrator does not know who the suspect is." R.C. 2933.83(B)(5).

{¶40} Evidence of a failure to comply with the lineup provisions "shall be considered by trial courts in adjudicating motions to suppress eyewitness identification resulting from or related to the lineup" and "shall be admissible in support of any claim of eyewitness misidentification resulting from or related to the lineup as long as that evidence otherwise is admissible." R.C. 2933.83(C)(1)(2).

{¶41} As to this point, the trial court stated that it reviewed the videotape of Keyoshia's interview, which showed that Cpt. Foley did not partake in the questioning but only attempted to get Keyoshia to cooperate with the detectives and then left the room. The court also found the fact that Cpt. Foley had knowledge of the case did

not disqualify him from being a blinded administrator.

**{¶42}** Cpt. Foley was the final witness at the suppression hearing. Cpt. Foley conducted the photo lineups. (Suppression Tr. 63). He stated that he did not prepare the lineups. (Suppression Tr. 63). When he was given the ten folders containing the photos, Cpt. Foley stated he assumed the suspects were in the folders but he did not know which folders they were in. (Suppression Tr. 64). He stated that he conducted the lineup of each suspect separately. (Suppression Tr. 64). And he stated that he instructed the witnesses not to show him any of the photographs. (Suppression Tr. 65).

**{¶43}** Cpt. Foley stated that although he did not participate in Keyoshia's interview, he did enter the interview room briefly to ask her if she would cooperate in the investigation. (Suppression Tr. 65).

**{¶44}** On cross-examination, Cpt. Foley stated that he was probably a "blinded administrator," although he was unsure of the Revised Code definition, because he did not know how the lineup was set up but he did have information on the case. (Suppression Tr. 84). He also stated that he was aware of the names of the two suspects. (Suppression Tr. 70).

**{¶45}** Det. Sweeney testified that he compiled the photo lineup. (Suppression Tr. 28). Det. Sweeny placed six photographs and four blank silhouettes into ten folders. (Suppression Tr. 28). He made two different sets of ten, one set containing appellant's photograph and one set containing McCrary's photograph. (Suppression Tr. 28). After he finished making the lineups, Det. Sweeney gave them to Cpt. Foley. (Suppression Tr. 29). Det. Sweeney testified that Cpt. Foley did not observe him assemble the lineups nor did he tell Cpt. Foley who was in the lineups or what order the photographs were in. (Suppression Tr. 29). He also testified that Cpt. Foley showed the lineups to the witnesses. (Suppression Tr. 29).

**{¶46}** Additionally, a review of the videotape of Keyoshia's interview shows that the interview was conducted by Det. Sgts. Sweeney and Spotleson. Cpt. Foley only entered the room briefly when Keyoshia became upset and uncooperative. Cpt.

Foley did not question Keyoshia but simply asked her to cooperate. He then left the interview room.

**{¶47}** Applying the statutory definition to Cpt. Foley's testimony indicates that he was a "blinded administrator." Cpt. Foley knew the suspects' identities but he was unaware of which folder their photographs were in and had no part in preparing the photo lineups.

**{¶48}** Pursuant to the statute, it is preferable for a blind administrator to conduct the lineup. Pursuant to R.C. 2933.83(B)(2), when it is impracticable for a blind administrator to conduct the lineup, the administrator shall state the reason for that impracticability in writing. There is no evidence of record that Cpt. Foley gave any reason in writing as to why a blind administrator did not conduct the lineups. Pursuant to R.C. 2933.83(C)(1) and (2), the trial court was to consider this in adjudicating the motion to suppress and this information was also admissible at trial in support of a claim of eyewitness misidentification.

**{¶49}** While the trial court did not make specific mention of R.C. 2933.83(B)(2), it did examine whether Cpt. Foley was a "blind" or "blinded" administrator and concluded that he was a blinded administrator. Furthermore, appellant and McCrary only argued in their motion that Cpt. Foley was not a "blind administrator" because he participated in the investigation. They never asserted that Cpt. Foley failed to state a reason in writing as to why a blind administrator was not used. And such a failure to state a reason in writing, in and of itself, is not a basis to suppress an identification. Moreover, Cpt. Foley's testimony and the videotape of Keyoshia's interview support the trial court's findings. Thus, the trial court did not err in overruling the motion to suppress on this basis.

**{¶50}** Accordingly, appellant's second assignment of error is without merit.

**{¶51}** Appellant's third assignment of error states:

> DEFENDANT/APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶52} In this assignment of error, appellant asserts his conviction was against the manifest weight of the evidence. He contends the state's case was based entirely on improper and unreliable eyewitness testimony. He points out there was no physical evidence linking him to the shooting. Appellant contends his name was heard by a detective among the crowd that gathered at the crime scene and was provided by a woman who did not witness the shooting. The eyewitnesses then implicated him only after being told his name by the police so that someone would pay for their friend's murder.

{¶53} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 668 (1997). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 39.

{¶54} Yet granting a new trial is only appropriate in extraordinary cases where the evidence weighs heavily against the conviction. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This is because determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts who sits in the best position to judge the weight of the evidence and the witnesses' credibility by observing their gestures, voice inflections, and demeanor. *State v. Rouse*, 7th Dist. No. 04-BE-53, 2005-Ohio-6328, ¶49, citing *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996); *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Thus, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither

of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. No. 99-CA-149, 2002-Ohio-1152.

**{¶55}** The jury convicted appellant of aggravated murder in violation of R.C. 2903.01(B), which provides: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery, robbery[.]" The jury also convicted appellant of aggravated robbery in violation of R.C. 2911.01(A)(1), which provides: "No person, in attempting or committing a theft offense, * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

**{¶56}** There was no question that Brandon was robbed and killed on the night in question. The only real question at trial was whether appellant and McCrary were the individuals who carried out these crimes.

**{¶57}** The relevant evidence at trial was as follows.

**{¶58}** Keyoshia testified that on the night in question she was "chillin'" at Nautica's house on South Avenue with her one-year-old son, Nautica, Miranda, and Nautica's mother. (Tr. 466-467). She stated she called Brandon to walk her home. (Tr. 468-469). When Brandon arrived at Nautica's house, Keyoshia asked him to wait in the driveway while she went to get her son. (Tr. 470). When she came out with her son, Keyoshia saw two boys in the driveway with Brandon. (Tr. 471). She heard the boys tell Brandon he had five seconds to lift up his shirt and empty his pockets and she saw that they had guns. (Tr. 472-473). Keyoshia stated Brandon lifted up his shirt but did not empty his pockets. (Tr. 472). She stated that both boys then shot Brandon. (Tr. 473-474). She testified the boys then ran from the scene. (Tr. 474).

**{¶59}** Keyoshia further testified that at her police interview, she did not give the detectives the names of the shooters. (Tr. 479). She stated she was unsure of their names at the time. (Tr. 481). But she stated she was able to pick out the two

shooters' photographs from the photo lineups the police presented her with. (Tr. 480). Keyoshia stated she had known the two shooters and had gone to school with them. (Tr. 482). She then identified both appellant and McCrary in court as the two who shot Brandon. (Tr. 483).

{¶60} On cross examination, Keyoshia again stated that she knew appellant and McCrary and had spent time with them prior to the shooting. (Tr. 485). Keyoshia called appellant "Ray Royal" and McCrary "Little D." (Tr. 486). However, she admitted that when the police interviewed her, she repeatedly denied knowing who the shooters were. (Tr. 497). She also admitted telling the police that it was nighttime and she could not really see. (Tr. 499). And she admitted that when she was alone in the interview room she spoke to someone on her cell phone and told that person the police were trying to make her "say who it is" and she had no idea. (Tr. 501). Keyoshia also stated she had a conversation with Nautica and Miranda the day after the shooting and they were all unsure as to who the shooters were at the time. (Tr. 516-518). When asked by defense counsel if Det. Spotleson tried to tell her that it was Little D and Rayshawn, Keyoshia replied, "Yeah, but not really." (Tr. 521). She agreed that prior to her video-taped interview, Det. Spotleson mentioned the defendants' names. (Tr. 542). Keyoshia further admitted she had previously told police the shooters had their hoodies wrapped around their heads so she could not tell who they were. (Tr. 541). And when asked if she told the police what they wanted to hear, Keyoshia said "yes." (Tr. 547).

{¶61} On redirect examination, Keyoshia stated she did not name appellant and McCrary during her interview with police because she was "scared for her life." (Tr. 548).

{¶62} Nautica testified that on the night in question, Brandon came to her house while she was sitting on the porch with Keyoshia and Miranda. (Tr. 557). She stated that two boys walked up her driveway and put their hoodies up. (Tr. 560-561). Nautica stated the boys pulled out guns and the "big one" told Brandon to check his pockets. (Tr. 561, 565). She stated that the one who spoke was trying to make his

voice deep but she recognized the voice as belonging to Ray Royal. (Tr. 565). Nautica stated Ray Royal told Brandon he had five seconds. (Tr. 566). She testified she went inside the house to get her mom and as soon as she entered the house, she heard gunshots. (Tr. 567). Nautica stated she saw the boys run from her house, but that "Little D"/"Boosie" ran back to her driveway and picked up his "gun shell." (Tr. 568).

{¶63} Nautica stated the police interviewed her that night. (Tr. 577). She stated she provided the police with the names Ray Royal and Boosie. (Tr. 577-578). She testified she did not really know appellant but she had seen him at the store before and she knew his name. (Tr. 577). Nautica testified she told police that night that Ray Royal and Boosie shot Brandon. (Tr. 578-579). She stated, however, she was not able to pick out their pictures in the photo lineups. (Tr. 579). She stated she was not sure between two pictures. (Tr. 580). Nonetheless, Nautica testified she was certain it was Ray Royal and Little D/Boosie who shot Brandon on the night in question and she identified them both in court. (Tr. 580-581).

{¶64} On cross examination, Nautica stated that she wears glasses and cannot see very well. (Tr. 603). And she admitted that she was not wearing her glasses on the night of the shooting. (Tr. 604). Additionally, she stated that when she saw appellant that night, she "kind of" saw him. (Tr. 616).

{¶65} Miranda testified that she was at Nautica's house on the night in question with Nautica and Keyoshia. (Tr. 765-766). She testified that Brandon came to the house. (Tr. 767). While they were all outside, Little D and Ray Royal came up the driveway. (Tr. 774). She stated that they both pulled out guns, told Brandon he had five seconds to empty his pockets, and then they both shot him. (Tr. 775-776). Miranda stated they both then ran from the scene but Little D came back and picked up his shell. (Tr. 776).

{¶66} Miranda testified the police interviewed her that night, but she did not tell the police the names of the shooters. (Tr. 78). She said she was nervous and did not know what to say. (Tr. 780). However, Miranda stated she knew who Ray

Royal and Little D were from hanging out at a store near Nautica's house called "Ally's." (Tr. 781). She testified that when the shooters walked up to Brandon, she could see their faces. (Tr. 782). Miranda also stated that although she did not tell the police the shooters' names, the police already knew their names. (Tr. 782). She stated that she picked out Little D's picture from the photo lineup and she thought she picked out a second photo also. (Tr. 783). Miranda then identified appellant and McCrary as the two people who shot Brandon. (Tr. 783-785).

{¶67} On cross examination, Miranda admitted that during her police interview she repeatedly stated she did not know the shooters' names. (Tr. 791-792). She acknowledged that one of the detectives told her the names and she denied knowing them. (Tr. 792-793). She then concurred with defense counsel that the police told her who they were and she agreed. (Tr. 803).

{¶68} Another girl named Shaquala testified that earlier on the night in question, she hosted a party at her house. (Tr. 683). At some point during the evening, her cousin came to tell her that Cedrick Robinson was robbing Rayshawn and Little D. (Tr. 705-706). Brandon, who was helping Shaquala fix her speaker at the time, went to see what was going on. (Tr. 706). But all Shaquala saw was Little D standing by a tree. (Tr. 706).

{¶69} Det. Sweeney testified that after interviewing Miranda and Nautica, he had nicknames for the suspects of "Little D" and "Royal." (Tr. 851-852). He then determined their real names to be Rayshawn Royal and Deandre McCrary. (Tr. 852). Det. Sweeney stated he assembled photo lineups that Cpt. Foley administered. (Tr. 854-856). He stated that Nautica was not able to pick anyone out of the lineups. (Tr. 857). He stated Miranda identified McCrary. (Tr. 858). And he stated that Keyoshia identified both appellant and McCrary. (Tr. 860).

{¶70} Det. Spotleson testified that when he arrived on the murder scene, he stood among the crowd of people who had gathered and listened to what was being said. (Tr. 923-924). He heard the names Little D and Ray Royal being mentioned and testified that was how his investigation began. (Tr. 924- 925). Det. Spotleson

stated he pulled a girl aside at the scene who was yelling their names and spoke with her. (Tr. 924). However, she was not a witness to the shooting. (Tr. 924-925).

{¶71} Appellant's conviction was based on the identifications of the three eyewitnesses to the shooting. He is correct that there was no physical evidence linking him to the shooting. But in reviewing manifest weight of the evidence challenges, even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction as long as a reasonable juror could find the eyewitness testimony to be credible. *State v. Taylor*, 10th Dist. No. 12AP-870, 2013-Ohio-3699, ¶47. Thus, this case came down to the credibility of the three eyewitnesses.

{¶72} The jury was presented with some reasons to doubt the eyewitnesses' credibility, such as the witnesses initially telling police they did not know who the shooters were, the fact that the police suggested appellant's and McCrary's names to Miranda, and the fact that Nautica was not wearing her glasses on the night of the shooting. But they also gave the jury reasons to believe their testimony. The girls were sure in their identifications at trial. Nautica identified the shooters by their nicknames to the police during her interview. Keyoshia testified she did not initially identify the shooters to police because she was afraid for her life. And she did pick out both appellant's and McCrary's photographs from the lineups. And Miranda stated she was nervous and did not know what to say to the police. Additionally, the girls had known appellant and McCrary before the shooting.

{¶73} The jury is in the best position to judge eyewitnesses' credibility. *State v. West*, 7th Dist. No. 11 MA 33, 2012-Ohio-2758, ¶41. Furthermore, while it is known that eyewitness identification of strangers is often unreliable, *Doren*, 2009-Ohio-1667, ¶160, when the eyewitness knows the perpetrator, the identification is more reliable. See, *State v. Breedlove*, 7th Dist. No. 05 MA 110, 2008-Ohio-1550, ¶65; *Davis*, 76 Ohio St.3d at 113.

{¶74} In this case, not one, but three eyewitnesses identified appellant at trial as one of the two people they saw shoot Brandon. Thus, their identification

testimony was consistent with one another. The jury obviously believed their identifications to be credible. We will not second-guess this credibility determination by the jury. The jury's verdict was not against the manifest weight of the evidence.

**{¶75}** Accordingly, appellant's third assignment of error is without merit.

**{¶76}** Appellant's fourth assignment of error states:

DEFENDANT/APPELLANT'S CONVICTION MUST BE REVERSED DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.

**{¶77}** Appellant argues his counsel was ineffective for failing to insist that the trial court issue a decision on his motion to suppress and thereafter failing to object to the admission of the eyewitness identification testimony.

**{¶78}** To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. *Id.* To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, at paragraph three of the syllabus.

**{¶79}** Appellant bears the burden of proof on the issue of counsel's effectiveness. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In Ohio, a licensed attorney is presumed competent. *Id.*

**{¶80}** As discussed in appellant's first assignment of error, the trial court did issue a decision overruling appellant's and McCrary's joint motion to dismiss. Due to what was likely a clerical oversight, the judgment entry containing both appellant's and McCrary's names and case numbers was only filed in McCrary's case. The judgment entry was properly filed in appellant's co-defendant's case and we reviewed the merits of the trial court's decision overruling the motion to suppress. Therefore,

there is no prejudice to appellant.

**{¶81}** Moreover, as also discussed above, appellant's counsel was presumably aware of the trial court's judgment overruling his motion to suppress the eyewitness identifications. The motion to suppress was filed by and argued by both appellant's and McCrary's counsel. The court entered its judgment that same day and it contained both appellant's and McCrary's names and case numbers. The matter then proceeded to a joint trial. Because of the trial court's ruling denying the motion to suppress and finding the eyewitness identifications admissible, counsel would not be ineffective for failing to object to the identifications at trial.

**{¶82}** Accordingly, appellant's fourth assignment of error is without merit.

**{¶83}** Appellant's fifth assignment of error states:

DEFENDANT/APPELLANT WAS DENIED A FAIR TRIAL AND THEREFORE DUE PROCESS BECAUSE OF PROSECUTORIAL MISCONDUCT.

**{¶84}** Here appellant asserts the prosecutor engaged in misconduct during his closing argument. Specifically, appellant takes issue with the following comments by the prosecutor:

What you just heard the last 45 minutes or so, for a - - and I don't know the correct word, but in trying to keep with the theme here, excuse my language, would be what we refer to as bullshitization.

* * *

When you don't have a defense, you come up with something. The old trick is blame it on the police, blame it on the witnesses.

* * *

Again, old trick: If you don't have a defense, blame it on the police. Okay. Detective Spotleson stood in the crowd to see if he could get any information. He heard two names. It was these two

Defendants. That's how these two became persons of interest. They then became suspects, and they then became Defendants. We're not here - - and Detective Spotleson told you, there weren't warrants or apprehension orders issued because of what he heard in the crowd. Sometimes police get suspects by that. They got the two names, and that's who they investigated. Okay?

\* \* \*

The other thing you do, when you don't have a defense, besides attacking the police, is you go after the witnesses. And they tried to drag the testimony of these girls out as long as they could. And you know what? These girls gave different accounts as to what happened, until and except when they talked about Brandon getting killed.

(Tr. 977, 978-979, 985).

**{¶85}** The test for prosecutorial misconduct is whether the conduct complained of deprived the defendant of a fair trial. *State v. Fears*, 86 Ohio St.3d 329, 332, 715 N.E.2d 136 (1999). In reviewing a prosecutor's alleged misconduct, a court should look at whether the prosecutor's remarks were improper and whether the prosecutor's remarks affected the appellant's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "[T]he touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, ¶61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982). An appellate court should not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶121.

**{¶86}** Parties are generally afforded wide latitude in closing arguments. *State v. Spivey*, 7th Dist. No. 89-CA-172, (Jan. 13, 1997); *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). When reviewing whether a prosecutor's remarks during closing arguments were prejudicial, we must view the closing argument in its entirety.

*State v. Treesh*, 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (2001); *State v. Moritz*, 63 Ohio St.2d 150, 157, 407 N.E.2d 1268 (1980).

**{¶87}** Appellant objected to the comment about "bullshitization." (Tr. 977). The trial court overruled the objection yet cautioned the jury to remember that "this is just closing arguments." (Tr. 977).

**{¶88}** But appellant failed to object to either of the two comments regarding what defense attorneys do when they do not have a defense. Therefore, a plain error review applies to these comments. Plain error is one in which but for the error, the outcome of the trial would have been different. *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

**{¶89}** As to the "bullshitization" comment, although the trial court overruled appellant's objection, the court did caution the jury that the comment was merely part of closing arguments. Thus, the court warned the jury that the prosecutor's comment was simply part of the state's argument and was not meant as anything more. Furthermore, while the prosecutor's comment was unprofessional and clearly in bad taste, the comment was just one statement in an otherwise fair trial.

**{¶90}** The comments referring to what defense attorneys do when they do not have a defense were comments on the lack of evidence offered by the defense. The prosecutor is permitted to comment on the failure of the defense to offer evidence in support of its case. *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). Thus, these comments were not improper.

**{¶91}** Accordingly, appellant's fifth assignment of error is without merit.

**{¶92}** Appellant's sixth assignment of error states:

DEFENDANT/APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO THE CUMULATIVE ERRORS IN THESE PROCEEDINGS.

**{¶93}** Finally, appellant contends he was denied a fair trial due to the cumulative effect of the errors he has asserted.

**{¶94}** An appellate court may reverse a defendant's conviction based on the doctrine of cumulative error. Cumulative error occurs when errors deemed separately harmless deny the defendant a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

**{¶95}** As discussed, the only harmless error was that a copy of the judgment entry denying the motion to suppress was not filed in appellant's case. And as discussed above, appellant did not suffer any prejudice as a result. Multiple harmless errors do not exist in this case so as to have deprived appellant of a fair trial.

**{¶96}** Accordingly, appellant's sixth assignment of error is without merit.

**{¶97}** For the reasons stated above, the trial court's judgment is hereby affirmed.

Vukovich, J., concurs.

DeGenaro, P.J., concurs.